Commonwealth *v.* Sparks.

COMMONWEALTH *vs.* JERMAINE SPARKS.

Hampden. March 9, 2001. - April 6, 2001.

Present: MARSHALL, C.J., GREANEY, SPINA, & COWIN, JJ.

*Constitutional Law,* Admissions and confessions, Search and seizure. *Evidence,* Admissions and confessions, Expert opinion, Scientific test. *Search and Seizure,* Consent. *Deoxyribonucleic Acid. Witness,* Expert. *Practice, Criminal,* New trial, Capital case.

Evidence at a hearing on a motion to suppress incriminating statements established that the defendant was not in custody when questioned by police after going voluntarily to the police station; as a consequence, the judge correctly concluded that the reading of Miranda rights had not been necessary before the defendant made his statements and correctly denied the motion to suppress. [656-657]

A Superior Court judge correctly concluded that a criminal defendant, voluntarily present at a police station, consented to removing his shoes for photographing of the soles and the officers' examination of the soles did not constitute a search. [657-658]

A criminal defendant waived his objections to DNA analysis of bloodstains at a murder scene by not filing the appropriate pretrial motion and requesting a hearing, and failing to raise the issue in a motion for a new trial. [659-660]

At a murder trial, the judge properly allowed in evidence the expert testimony of the director of a forensic laboratory based on the witness's independent review of the empirical data of certain DNA matches produced by laboratory analysts. [660]

A Superior Court judge correctly denied a criminal defendant's motion for a new trial based on allegedly newly discovered evidence, which the judge concluded was completely incredible. [660-661]

INDICTMENTS found and returned in the Superior Court Department on October 15, 1996.

A pretrial motion to suppress evidence was heard by *William H. Welch,* J.; the cases were tried before *Constance M. Sweeney,* J., and a motion for a new trial was heard by her.

*Joseph A. Hanofee* for the defendant.

*James C. Orenstein,* Assistant District Attorney (*Jane Davidson Montori,* Assistant District Attorney, with him) for the Commonwealth.

GREANEY, J. A jury in the Superior Court convicted the defendant on two indictments charging murder, finding in each case that he had acted with deliberate premeditation and extreme atrocity or cruelty, and was guilty of felony-murder (with armed robbery as the predicate felony). Represented by new counsel on appeal, the defendant argues error in (1) the denial of his motion to suppress his statements to the police and photographs taken by them of his athletic shoes; (2) the admission of deoxyribonucleic acid (DNA) evidence by an expert witness; and (3) the denial of his motion for a new trial. We conclude that there is no error and no basis for granting relief under G. L. c. 278, § 33E.

It is not necessary to set forth in detail the findings that the jury could have made based on the Commonwealth's evidence.[1] It is sufficient to provide the following outline. On the night of the murders, the defendant, a huge man (seven feet tall, weighing approximately 300 pounds, and having a size sixteen EEE foot), was refused a loan of money by a coworker at the Springfield restaurant where he worked with the landlord of the victims, Hope Parrish and her thirteen month old daughter. After failing to obtain the loan, the defendant went to Hope's apartment door; he was seen on the common porch of the house by Hope's next door neighbor. After the defendant entered her apartment, he attacked Hope, who had attempted to defend herself and her daughter with a knife and nail file. Hope cut the defendant's hand in the struggle. Hope also may have tried to make a telephone call for help, but the defendant ripped the telephone from the wall. The defendant subdued Hope, killing her by stabbing her thirty-six times over her body with such force that he bent two knife blades and fractured her skull. The defendant murdered Hope's daughter by slashing her throat with a knife and fracturing her skull with a metal pot. The defendant took Hope's car keys, wallet, and money. He used the keys to steal Hope's automobile. After the murders, the defendant met his girl friend and spent some of Hope's money to buy crack cocaine. She provided incriminating testimony

---

[1]The trial judge, in her memorandum of decision on the defendant's motion for a new trial, aptly described the Commonwealth's evidence as presenting an overwhelming case for the defendant's convictions.

against him. Bloodstains consistent with the defendant's blood and his bloody palm print were found in Hope's apartment. There was also evidence of footprints left in the apartment by the defendant's size sixteen athletic shoes that had a distinctive pattern on their soles.

1. We reject the defendant's argument that the motion judge improperly denied his motion to suppress his oral and written statements to the police.[2] The defendant claims that he was in custody when questioned, and, therefore, the police were required to provide him with Miranda warnings.

The judge held an evidentiary hearing on the motion to suppress, and he entered a memorandum of decision in which he made findings of fact and conclusions of law. The judge's findings of fact are supported by the evidence that he found credible, and we accept them. See *Commonwealth* v. *Robinson*, 399 Mass. 209, 215 (1987), quoting *Commonwealth* v. *Moon*, 380 Mass. 751, 756 (1980). The judge found that the defendant went voluntarily to the police station. When he was questioned there, the defendant was not restrained in any way, and there was no probable cause to arrest him. At the time of the interview, the defendant was not the focus of the investigation; the police were still investigating the killings and were talking to numerous people (the defendant among them) who may have had some contact with Hope. The interview was relaxed and amicable, not confrontational, and the defendant willingly answered questions asked of him. (The judge found that "[t]he questioning was influenced in its contours by the defendant and his answers.") The defendant read and signed his written statement, which contained no confession. When the interview was completed, the police offered the defendant a ride back to work. The defendant declined the offer, and he was allowed to leave the police station.

The judge applied the factors set forth in *Commonwealth* v.

---

[2] In his statements to the police, the defendant denied having been at Hope's apartment on the night of the murders and stated that he had cut his right hand while slicing tomatoes on the day following the murders. At trial, the Commonwealth used the defendant's statements to contradict his testimony that he had cut his hand at work on the day before the murders.

*Bryant*, 390 Mass. 729, 737 (1984),[3] for determining whether a police interview of a person or suspect takes place in custodial circumstances requiring the administering of Miranda warnings. The judge correctly concluded that the questioning of the defendant did not take place in a coercive environment, that is, an environment where the police have so restricted the freedom of the person interviewed as to render him "in custody." Rather, as the judge properly found on the evidence, the defendant's interview was part of an ongoing investigation in which the police were still attempting to identify the murderer. Consistent with its investigatory purpose, the interview was not confrontational. Importantly, the defendant was free to leave the police station at any time. The judge properly disregarded the fact that police suspicion about the defendant was heightened during the interview because he was a "tall and stocky" black male (this general description was furnished by the neighbor who had seen such a man on the night of the murders on the porch of the house where the victims lived), who had large feet and cuts on his hands. See *Commonwealth* v. *Morse*, 427 Mass. 117, 127 (1998). Nor was it significant in the circumstances, as the judge concluded, that after the interview ended, the police placed the defendant under surveillance. In addition, the fact that the interview took place at a police station did not render it custodial, particularly where the defendant accompanied the police to the police station on his own volition and left the station after the interview ended. See *Commonwealth* v. *Gil*, 393 Mass. 204, 212 (1984). Because, from the perspective of a reasonable person in the defendant's position, there was no restraint on the defendant's freedom of movement of the degree associated with formal arrest, Miranda rights were unnecessary. The defendant's motion to suppress his statements was correctly denied. See *Commonwealth* v. *Larkin*, 429 Mass. 426, 432-436 (1999); *Commonwealth* v. *Morse*, *supra* at 122-127; *Commonwealth* v. *Jung*, 420 Mass. 675, 687-689 (1995).

2. During the interview, the police asked the defendant

---

[3]As to the second factor set forth in *Commonwealth* v. *Bryant*, 390 Mass. 729, 737 (1984) (whether the investigation had begun to focus on the suspect, including whether there was probable cause to arrest the suspect), see *Commonwealth* v. *Morse*, 427 Mass. 117, 125 n.6 (1998), where we expressed doubt whether that factor was ever relevant to the Miranda inquiry.

whether they could look at the soles of his athletic shoes. The defendant responded by lifting his feet so the police could view the bottoms of the shoes. A police photographer was brought in to photograph the shoes. The photographer suggested that the shoes should be removed so he could more easily obtain photographs. The defendant agreed to do so and took his shoes off, and, when the photographer finished, the shoes were returned to the defendant. The defendant argues that the shoes were "seized" by the police without his consent and that the photographs, therefore, were unconstitutionally obtained. The defendant argues that all evidence derived from the photographs should have been suppressed.

The judge found that the police had seen footprints in the victims' apartment and were collecting photographs of the bottoms of numerous shoes to compare with those footprints. The judge also found, and concluded, that taking photographs "of the sole[s] of [the defendant's] shoes [was] agreed to [by the defendant and] was not the result of any coerced or involuntary action [on the defendant's part]. He freely and openly took off his shoes so they could be photographed." The judge's findings and conclusions are supported by the evidence. The police examination of the soles of the defendant's athletic shoes did not constitute a search, see *Commonwealth* v. *Billings*, 42 Mass. App. Ct. 261, 264-266 (1997), and, because the defendant consented to removing his shoes so they could be photographed, there was no illegal seizure. The photographs were part of the interview process which, as we have concluded, violated no constitutional rule. This aspect of the defendant's motion to suppress was properly denied by the motion judge.

3. The Commonwealth introduced the expert testimony of Dr. Robin Cotton, the laboratory director of Cellmark Diagnostics Laboratories (Cellmark), a recognized forensic laboratory located in Germantown, Maryland. Dr. Cotton testified about Cellmark's DNA testing (by means of the polymerase chain reaction [PCR] method) of DNA obtained from bloodstains found in the victims' apartment and the statistical frequencies of matches between the DNA derived from the bloodstains and the DNA of the victims and the defendant.

Before Dr. Cotton was called to the witness stand, the

defendant's trial counsel objected to her testimony on the basis that she was not the actual staff scientist who had conducted the initial reviews of the analysts' reports; rather, in reaching her conclusions, she had reviewed the records, analysis, and results of Cellmark analysts who had conducted the testing, and of other Cellmark staff scientists (or reviewers) who had conducted the initial review of the analysts' work. Trial counsel argued that Dr. Cotton's testimony could not be admitted unless the Cellmark analysts involved in the testing were also called to testify. The judge held an evidentiary voir dire at which Dr. Cotton testified and was cross-examined. The judge overruled trial counsel's objection, concluding that Dr. Cotton was a qualified expert in the field of DNA testing, who, although not the initial staff scientist who reviewed the analysts' work, had conducted "an independent review of the empirical data separate and apart from the review undertaken by the [analyst]" that "encompasse[d] all that the original [staff scientist had done]." The judge then permitted Dr. Cotton to testify to her opinions under the rule that "an expert [may] base an opinion on facts or data not in evidence if the facts or data are independently admissible and are a permissible basis for an expert to consider in formulating an opinion. [This] . . . eliminate[s] the necessity of producing exhibits and witnesses whose sole function is to construct a proper foundation for the expert's opinion." *Department of Youth Servs.* v. *A Juvenile*, 398 Mass. 516, 531 (1986). See *Commonwealth* v. *O'Brien*, 423 Mass. 841, 851-852 (1996), *S.C.*, 432 Mass. 578 (2000). The defendant's appellate counsel now raises an entirely new basis to exclude Dr. Cotton's testimony. He argues that the testimony should have been excluded because the DNA testing kits used by Cellmark, and its database for formulating statistical frequencies, were not shown to be scientifically reliable. We reject the argument.

To preserve objections to DNA analysis of the type in issue, a defendant must file an appropriate pretrial motion stating the grounds for the objections and request a hearing in accordance with the principles set forth in *Canavan's Case*, 432 Mass. 304, 309-312 (2000), and *Commonwealth* v. *Lanigan*, 419 Mass. 15, 24-27 (1994). The defendant's trial counsel made no such motion in this case, apparently for tactical reasons. Dr. Cotton's

testimony was cumulative of the evidence presented by the Commonwealth's serologist (although it did focus on the identifications with more particularity than those obtained by blood typing). Trial counsel also may have considered Cellmark's reputation for quality forensic work, Dr. Cotton's position at Cellmark (laboratory director), and the fact that, prior to trial, in *Commonwealth* v. *Rosier*, 425 Mass. 807, 813-817 (1997), we had upheld similar DNA testing by Cellmark and its database formulations. Further, trial counsel likely anticipated the defendant's trial testimony, namely, his admission that he had bled all over Hope's apartment from cuts on his hands.[4] Nor did the defendant raise these issues in a motion for a new trial. Consequently, it is now too late to raise objections concerning the reliability of the testing and the conclusions reached.

In addition, the defendant's appellate counsel conceded at oral argument on the appeal that no expert evidence exists to challenge the scientific validity of Dr. Cotton's testimony or the conclusions reached by Cellmark. As such, the objections made in the defendant's brief lack factual foundation. In view of the only objection made at trial prior to Dr. Cotton's testimony, and no persuasive showing here that the testing was unreliable, the judge properly admitted Dr. Cotton's testimony under the rule stated in *Department of Youth Servs.* v. *A Juvenile, supra.*

4. The trial judge properly denied the defendant's motion for a new trial after an evidentiary hearing. The defendant's motion was based on allegedly newly discovered evidence suggesting that the police had planted a knife in the defendant's bedroom during the execution of a search warrant. In support of the motion, the defendant offered the testimony of the owner of the house where the defendant lived. In her affidavit, the owner

---

[4]The defendant testified that he obtained a cut on his hand during an encounter with an intruder in Hope's apartment. He testified that, on the night of the murders, he went to visit Hope's landlord and noticed that the door to Hope's apartment was ajar. After ringing the doorbell without response, he entered the apartment where he claimed that he was hit from behind by a man wearing a black mask and gloves, who was holding a knife. The man approached the defendant with the knife and cut the defendant's hand with it as the defendant raised his hands up in his own defense. The man then ran out the door. The defendant testified that his hand bled not only from the cut he received from the masked intruder, but also from a cut to his hand that he had sustained at work.

claimed that, on the day or days before the police had claimed to have seized a steak knife with bloodstains on it from under a mattress in the defendant's bedroom while executing a search warrant, the police, in her presence and with her assistance, had conducted a warrantless search of the defendant's bedroom, including searching under the defendant's mattress and bed frame which revealed nothing.

In her memorandum of decision on the motion, the judge found the owner's evidence completely untruthful, noting that her testimony contradicted her affidavit, and that both her affidavit and testimony were shown by cross-examination to be false. As the judge noted, the witness "self-immolat[ed]" on the stand. The judge's findings rejecting the motion are based on credibility, and, as such, are final and conclusive on the issue. See *Commonwealth* v. *Bernier*, 359 Mass. 13, 16 (1971), and cases cited.

5. After reviewing the record under G. L. c. 278, § 33E, we conclude that the interests of justice do not require a reduction in the murder verdicts or a new trial.

6. The judgments of conviction and the order denying the defendant's motion for a new trial are affirmed.

*So ordered.*