COMMONWEALTH *vs.* ROYCE HILL.

No. 00-P-653.

Suffolk. October 15, 2001. - May 10, 2002.

Present: BROWN, CYPHER, & KAFKER, JJ.

*Identification. Evidence,* Identification, Photograph, Testimony of third party respecting identification, Expert opinion, Hearsay, Scientific test. *Deoxyribonucleic Acid.*

At a criminal trial in which the victim was never asked to identify the photograph that she had previously selected from an array as that of her attacker, the judge erred in permitting a third party to testify that the victim had selected the defendant's photograph from the array; however, such error did not create a substantial risk of a miscarriage of justice, where defense counsel used the testimony to argue misidentification and bias on the part of police, and where other evidence submitted at trial established the victim's identification of the defendant and linked the defendant to the crime. [691-693]

At a criminal trial, the judge did not abuse his discretion by permitting the prosecution's expert witness to testify relying on facts not in evidence (i.e., test results conducted by a lab analyst), where the expert's opinion was primarily based on her own experience and expertise as independently applied to the test results, and where the defendant failed to establish, by a timely challenge or by cross-examination at trial, that the test results were the product of improperly or unreliably performed testing procedures [693-700]; further, while the expert went beyond giving an opinion in testifying at length regarding the facts and data that formed the basis of her opinion, such testimony was cumulative of testimony offered by the defendant's own expert and was not evidence of the type likely to affect the outcome of the trial [700].

INDICTMENTS found and returned in the Superior Court Department on November 8, 1995.

The cases were tried before *Patrick F. Brady,* J.

*Eric S. Brandt,* Committee for Public Counsel Services, for the defendant.

*Brian J.S. Cullen,* Assistant District Attorney, for the Commonwealth.

CYPHER, J. A jury convicted the defendant of home invasion, robbery, two counts of rape, assault and battery, and indecent assault and battery. On appeal, the defendant claims that (1) police testimony that established that the victim had selected the defendant's photograph from an array was improperly admitted because the victim was never asked at trial to select the photograph she had previously identified, and (2) the testimony of the Commonwealth's expert witness about the deoxyribonucleic acid (DNA) testing was based solely on inadmissible hearsay. We affirm.

The jury could have found the following facts. On the morning of October 19, 1995, the defendant walked through the front door of an elderly woman's apartment. The defendant grabbed the woman, dragged her into the bedroom, and forced her onto her back, on the bed. The defendant kissed her left breast, put his mouth on her vagina and then inserted his penis into her vagina and ejaculated. The defendant searched the apartment, took various household items and a small amount of money, and left.

The only issue at trial was the identity of the perpetrator.

1. *Pretrial photographic identification.* When asked at trial to identify the man who had attacked her, the victim pointed to a man other than the defendant but indicated that she was uncertain. The victim also testified that, when police had shown her some photographs and asked her if she could identify the person who had attacked her, she "picked [the photograph] right out," and told the detective, "That's him." The prosecutor did not ask the victim to identify the photograph she had selected. Instead, the prosecutor called Detective Garvin as a witness, and he testified that the victim had selected the defendant's photograph. Garvin also testified that he and the victim initialed the photograph. The photograph was admitted in evidence.

The defendant argues that Garvin's testimony violated the prohibition set forth in *Commonwealth* v. *Daye*, 393 Mass. 55, 60-61 (1984), against using extrajudicial identification by a third party as substantive evidence when the identifying witness does not acknowledge the identification or does not explicitly state that she identified the defendant. The defendant did not

object, so our review is limited to a determination whether any error created a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Bassett*, 21 Mass. App. Ct. 713, 719 (1986).

*Commonwealth* v. *Daye, supra* at 62-63, prohibits the Commonwealth from improving its "position by declining to ask the identifying witness to select at trial the photograph previously identified." See *Commonwealth* v. *Seminara*, 20 Mass. App. Ct. 789, 796 (1985). Without a proper foundation, it was error to permit Garvin to testify that the victim had selected the defendant's photograph. See *Commonwealth* v. *Daye, supra*; *Commonwealth* v. *Seminara, supra* at 796; *Commonwealth* v. *Muse*, 35 Mass. App. Ct. 466, 470 (1993); *Commonwealth* v. *Day*, 42 Mass. App. Ct. 242, 247 (1997).

Nevertheless, the error did not create a substantial risk of a miscarriage of justice. First, trial counsel effectively used the evidence to bolster the defense theory that the police were biased against the defendant and had skewed the investigation in a manner that would insure the erroneous identification of the defendant.[1] Second, the jury would have easily been able to conclude from other evidence that the victim had identified the

---

[1] The day after the incident, the defendant spoke to his mother's landlord, Thomas McElhinney. At trial, McElhinney testified that the defendant told him that he had witnessed a crime in Chelsea, that he had tried to help the woman and held her head in his hands, but that he was now concerned about his fingerprints being in the apartment. The defendant also said that he did not rape the woman and that "he thought he noticed a Dominican gentleman attack [the] woman." McElhinney reported this conversation to police.

Upon receipt of the report, the police asked the defendant to come to the police station. When he arrived later the same day, Garvin showed the defendant photographs and asked him if he could identify the Dominican man he claimed he had seen at the crime scene. The defendant selected a photograph of a man bearing a "remarkable resemblance" to the defendant. A copy of the photograph the defendant selected was introduced in evidence by defense counsel. Despite this resemblance, Garvin did not include the photograph the defendant selected in the array that he showed to the victim. Defense counsel argued to the jury that the photograph the defendant selected was not included in the array because the police did not want to confuse the victim and risk her not selecting the photograph of the defendant. Defense counsel emphasized that this occurred even though the photograph of the Dominican man more closely resembled the composite drawing that the victim had helped create (and which was admitted in evidence) than did the defendant's photograph.

defendant.[2] Third, in light of the other evidence admitted at trial, any error did not create a substantial risk of a miscarriage of justice. That evidence included a composite drawing resembling the defendant; DNA evidence that supported the conclusion that the defendant was the attacker, see *infra*; serology evidence that the attacker, like the defendant, did not secrete blood in his bodily fluids, a characteristic found in about fifteen percent of the population; the defendant's statements; and the victim's description of her attacker, which matched the defendant's appearance in material respects.

2. *DNA evidence.* At trial, the Commonwealth introduced the expert testimony of Dr. Jennifer Reynolds, a staff scientist at Cellmark Diagnostics (Cellmark), a recognized forensic laboratory specializing in the analysis of DNA. See *Commonwealth* v. *Sparks*, 433 Mass. 654, 658-659 (2001). The defendant claims that Dr. Reynolds's testimony was inadmissible hearsay because it depended entirely on the out-of-court assertions of another (the analyst who conducted the tests) for its factual basis. The defendant did not object on this ground below.[3] We conclude that the judge did not abuse his discretion, much less create a substantial risk of a miscarriage of justice, when he ruled that the expert could base her opinion on the testing that he found had been properly conducted under the rule stated in *Department of Youth Servs.* v. *A Juvenile*, 398 Mass. 516 (1986). See

---

[2]The victim made absolutely clear in her testimony that, upon viewing the array, she immediately identified a single photograph of the person that she was sure was her assailant. The jury also heard that, upon being informed of her selection, Garvin went to the room the defendant was waiting in at the police station and arrested him. Thus, the jury would likely have concluded that the victim had selected the defendant's photograph. See *Commonwealth* v. *Cordle*, 404 Mass. 733, 743-744 (1989); *Commonwealth* v. *Zavala*, 52 Mass. App. Ct. 770, 774 (2001). Such a conclusion would have substantial support in other identification evidence, including the composite sketch that resembled the defendant, the DNA evidence discussed below, and the defendant's statements that he was at the crime scene.

[3]During trial, the defendant's position never progressed beyond his claim that Dr. Reynolds's testimony should be struck because it was based entirely on the Cellmark file that was not and could not be admitted in evidence because it did not qualify as a business record. Although the judge initially admitted the file as a business record, at the end of the trial, he excluded it after concluding that the file had been created after litigation commenced. See G. L. c. 233, § 78. In its stead, the judge permitted in evidence only a few documents, to which trial counsel gave his approval.

*Commonwealth* v. *Waite*, 422 Mass. 792, 804 (1996); *Canavan's Case*, 432 Mass. 304, 312 (2000) (abuse of discretion standard applied to trial judge's analysis under *Commonwealth* v. *Lanigan*, 419 Mass. 15 [1994]).

Dr. Reynolds testified that, at the joint request of the defendant and the prosecution, Cellmark tested five sets of items taken in the aftermath of the crime. She concluded that the testing disclosed that the defendant could not be excluded as the source of the sperm detected on the vaginal swab and the victim's pants or as the source of the material detected on the swab of the victim's left breast. She also concluded that the results indicated that the approximate frequencies for a match in the African-American population between the genotypes analyzed in the tested samples, when compared with the genotypes obtained from the defendant's blood sample, were one in 160 million.[4] Dr. Reynolds described the basis of her opinion, explaining that, while she neither personally conducted

---

[4]According to Dr. Reynolds, two polymerase chain reaction (PCR) based tests were conducted: a PM plus DQA1 test, which looked at six variable genetic sites, and a short tandem repeats (STR) test, which looked at four loci.

The PCR method and the two PCR-based tests used in this case have been carefully explained by the Supreme Judicial Court. In *Commonwealth* v. *Rosier*, 425 Mass. 807, 811-812 (1997), the court explained STR testing and cited with approval its decision in *Commonwealth* v. *Vao Sok*, 425 Mass. 787, 800-801 (1997), in which the court explained the test that identifies the genetic variables located at the DQA1 and PM loci. In each instance the court ruled that the PCR method and the PCR-based tests of the loci described above were scientifically reliable. *Commonwealth* v. *Rosier, supra* at 813; *Commonwealth* v. *Vao Sok, supra* at 802-803. The defendant, appropriately, raises no challenge to the scientific validity of these tests.

In *Canavan's Case, supra* at 312, the Supreme Judicial Court overruled that portion of *Commonwealth* v. *Vao Sok* in which the court had declared that review of a judge's decision under *Commonwealth* v. *Lanigan*, 419 Mass. 15 (1994), regarding whether to admit new scientific evidence is de novo. The court held that an abuse of discretion standard would be applied to review a trial judge's *Lanigan* determination. *Canavan's Case, supra* at 312. The other aspects of the court's decision in *Commonwealth* v. *Vao Sok*, including validation of PCR-based testing and, in particular, testing at the DQA1 and PM loci, were unaffected by *Canavan's Case*. The test set forth in *Frye* v. *United States*, 293 F. 1013 (D.C. Cir. 1923), survives both *Commonwealth* v. *Lanigan, supra* at 24-25, and *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), where there is general acceptance of a theory or process in the relevant scientific community. See *Canavan's Case, supra* at 310. See generally *Frye* v. *United States, supra* at 1014.

the testing nor personally supervised it, part of her job at Cellmark included testifying in court regarding tests that Cellmark performed. Dr. Reynolds testified that "if [she] did not personally technically review the case when the report was signed, [she] technically review[s] the case very thoroughly so that [she is] able to come to court with complete knowledge and understanding of the contents of the case folder and the work that was done."[5]

Dr. Reynolds's testimony was properly admitted. When considered closely, the defendant's argument that Dr. Reynolds's opinions should have been excluded, either because she lacked personal knowledge of the testing or because the testing had not been admitted in evidence and therefore its reliability could not be assessed, is irreconcilable with *Department of Youth Servs.* v. *A Juvenile*, 398 Mass. at 531-532. There, the Supreme Judicial Court held that, in addition to personal knowledge and facts contained in a hypothetical question, an expert may "base an opinion on facts or data not in evidence if the facts or data are independently admissible and are a permissible basis for an expert to consider in formulating an opinion." *Id.* at 531. The court took this "modest step" to "eliminate the necessity of producing exhibits and witnesses whose sole function is to construct a proper foundation for the expert's opinion." *Ibid.*

The rule permits an expert to formulate an opinion based on facts or data that are independently admissible. "[A]dmissible" is defined in Webster's Third New Intl. Dictionary 28 (1993) as "capable of being allowed . . . entitled or worthy to be admitted." Facts or data that are independently admissible by

---

[5]The "case" Dr. Reynolds reviewed consisted of a file containing virtually everything related to the testing conducted by Cellmark. Dr. Reynolds brought the Cellmark file with her to court. The file was fairly thick, containing approximately one hundred separate pieces of paper. Among the numerous documents was the original film on which the DNA samples were tested at the DQA1 and PM loci, and the original film, known as an autorad, on which several loci of each DNA sample were tested for STRs. "An autoradiograph, or 'autorad,' is a piece of X-ray film which demonstrates the relative positions and lengths of alleles which have been identified by genetic probes." *Commonwealth* v. *Lanigan*, 413 Mass. 154, 157 n.6 (1992), *S.C.*, 419 Mass. 15 (1994). The autorad was shown to the jury and admitted as an exhibit. The jury were also shown, as a chalk, several charts summarizing the results that were in the file and had been prepared by Dr. Charlotte Word.

definition, therefore, need not actually be admitted before an expert may rely on them to form an opinion. Thus, to the extent the defendant is simply arguing that Dr. Reynolds's testimony was inadmissible because it was based on facts or data not in evidence, the argument fails.[6]

After the briefs were submitted in this case, the Supreme Judicial Court issued a decision considering a similar issue. In *Commonwealth* v. *Sparks*, 433 Mass. 654, 659 (2001), the defendant argued at trial that because the expert, Dr. Cotton, was not the actual staff scientist who had conducted the initial review of the analyst's work and had not conducted the analysis, her testimony could not be admitted unless the Cellmark analysts involved in the testing were also called to testify. Although appellate counsel in *Commonwealth* v. *Sparks* focused on a different issue, the Supreme Judicial Court touched upon trial counsel's objection and affirmed the trial judge's decision to admit Dr. Cotton's testimony. *Id.* at 659-660. The Supreme Judicial Court stated that, because the defendant had made no persuasive showing "that the testing was unreliable, the judge properly admitted Dr. Cotton's testimony under the rule stated in *Department of Youth Servs.* v. *A Juvenile, supra* [at 531]." *Commonwealth* v. *Sparks, supra* at 660. See *Commonwealth* v. *Leinbach*, 29 Mass. App. Ct. 943, 944 (1990) (testimony of a senior chemist from the Department of Public Safety crime laboratory regarding weight and content of eight bags of contraband was admissible even though the chemist had not performed the tests).

Here, the defendant's argument that Dr. Reynolds's testimony ought to be excluded as hearsay is in part premised on his contention that Dr. Reynolds simply read from the Cellmark file rather than conducted her own independent analysis of the laboratory results. The judge observed that Dr. Reynolds "did say certain things that were really reading from records" and that Dr. Reynolds "may have to some extent [] read to [the jury] the

---

[6]In fact, the judge stated that he had "no doubt that [the original film of the PM and DQA1 testing] *could be admitted*" (emphasis added) because both sides had "every opportunity to review and did review" the testing that was done in this case, and there was never a live issue raised concerning the validity of the testing.

content of a record." The use of the terms "certain things" and "to some extent" signal that the judge viewed Dr. Reynolds as having read from only a part of the Cellmark file. The judge offered to remedy the error by excluding that part of Dr. Reynolds's testimony, and also ruled that the other portions would remain in evidence. Trial counsel's inability to recall any specific statements that should be excluded on these grounds evidences the nonprejudicial nature of the testimony.

Moreover, it is clear from the entire record that Dr. Reynolds's opinions were primarily based on her own experience and expertise as independently applied to test results obtained in this case. Dr. Reynolds's explanations concerning the sample forms she brought with her, her description of the testing Cellmark does generally, and the specific testing that was done in this case, including references to the original film that showed the results of the STR testing, demonstrate that she independently reviewed the empirical data generated in this case.[7] This conclusion is also bolstered by trial counsel's closing argument, in which he urged the jury to discredit the testing because there was a discrepancy between Dr. Reynolds's analysis of the test results and those reported by the Cellmark analyst and supervising staff scientist. This argument provides a clear indication that Dr. Reynolds did not simply parrot the reports of others.

To the extent that the defendant's argument may also be viewed as raising the suggestion that the facts and data underlying Dr. Reynolds's testimony may have been based on improperly or unreliably performed testing procedures, that argument also fails. Generally, a challenge to the foundation of the expert's opinion must be made before an expert testifies. See Commonwealth v. Beausoleil, 397 Mass. 206, 220-221 (1986); Department of Youth Servs. v. A Juvenile, 398 Mass. at 532; Commonwealth v. Vao Sok, 425 Mass. at 798. More specifically, "[t]o preserve objections to DNA analysis [on the basis of reliability], a defendant must file an appropriate pretrial motion

---

[7]Additionally, during a bench conference regarding the admissibility of the Cellmark file, the prosecutor stated, without contradiction by defense counsel, that Dr. Reynolds had reviewed and reconfigured the entire report in order to obtain her own results. Even the defendant on appeal acknowledges that Dr. Reynolds reviewed the file in accordance with her job responsibilities, which include "technically review[ing] the case very thoroughly" before testifying.

stating the grounds for the objections and request a hearing in accordance with the principles set forth in *Canavan's Case*, 432 Mass. 304, 309-312 (2000), and *Commonwealth* v. *Lanigan*, 419 Mass. 15, 24-27 (1994)." *Commonwealth* v. *Sparks*, 433 Mass. at 659.

At a pretrial hearing, trial counsel stated that the testing may have been contaminated, and the judge, appropriately, responded that if evidence is presented "as to cast into doubt the results [of the DNA testing]" he would consider further hearings on its admissibility. That proof, however, was never forthcoming.[8] Trial counsel in this case, as in *Commonwealth* v. *Sparks*, 433 Mass. at 659-660, may have chosen to forgo such a motion for tactical reasons. The defendant argues that this strategic choice was manifestly unreasonable. See *Commonwealth* v. *Adams*, 374 Mass. 722, 728 (1978). We disagree.

The defendant's own expert, Dr. James McClintock, who reviewed all of the DNA testing done at Cellmark, opined that the STR testing had been contaminated and was, therefore, completely unreliable. Dr. McClintock also reviewed the Cellmark testing at the PM and DQA1 loci and concluded that his analysis of these tests was consistent with the results obtained by Cellmark. Based on the testing at the PM and DQA1 loci, Dr. McClintock gave an opinion that defendant's genetic profile, which matched the profile detected on DNA samples taken from the crime scene, occurs in the population with a frequency of one in 30,581. In view of this evidence, trial counsel may have concluded that it would be more advantageous for the defense to introduce evidence of test contamination, rather than to seek

---

[8]The defendant's failure to raise any issue regarding the reliability of the test procedures was apparent at trial. For example, when the judge finally excluded the Cellmark file, but allowed Dr. Reynolds's testimony to remain in evidence, he made clear that he was doing so under the rule in *Department of Youth Servs.* v. *A Juvenile*, 398 Mass. at 531, that permits an expert to testify on the basis of information that is not in evidence. The judge noted that both sides had "every opportunity" to review and did review the testing that was done in this case, and there was never a live issue concerning the validity of the testing. Having made this statement after hearing extensive testimony from each party's expert, including a voir dire of the Commonwealth's expert, it is clear that the judge found that the DNA testing conducted by Cellmark in this case was done in accordance with valid scientific theory and reliable methodology that provided a sound basis upon which an expert may formulate an opinion.

its exclusion. Because his expert had not uncovered any information that suggested testing at the PM and DQA1 loci was improperly done, it was virtually certain that those tests would be admitted. In view of this, defense counsel may have reasonably concluded that evidence of contamination in the STR testing could be used to argue that the other tests were tainted. The defendant did not file a motion for new trial raising any issue related to the reliability of the testing; "[c]onsequently, it is now too late to raise objections concerning the [testing procedures employed] and the conclusions reached." *Commonwealth* v. *Sparks*, 433 Mass. at 660.

The defendant now urges the court to consider that he "was unable to cross-examine [Dr. Reynolds] about . . . whether the testing was conducted in a way that may have contaminated the samples and whether the analyst who conducted the testing was biased in favor of the Commonwealth" and "whether any of the errors ('false positives') committed during internal proficiency testing had been committed by the analyst in this case." The defendant argues that, because he could not conduct a fruitful cross-examination in these areas, the testing cannot be determined to be reliable and, therefore, may not form a basis upon which an expert may formulate an opinion.[9]

The defendant's assertions on appeal regarding which additional areas might have been probed on cross-examination simply do not suffice to establish that the testing in this case was so unreliably performed as to require the exclusion of the expert's testimony based on it.[10] See *Commonwealth* v. *Haas*, 373 Mass. 545, 563 (1977), *S.C.*, 398 Mass. 806 (1986) (where substantial authority exists to establish the reliability of an opinion given by an expert, the testimony need not be proved infallible to be admissible); *United States* v. *Martinez*, 3 F.3d 1191, 1198 (8th Cir. 1993) (allegation of failure to properly apply scientific principle should provide basis for exclusion of

[9]We note that nothing prevented the defendant from summonsing the analysts. We also note that the defendant has not filed a motion for new trial or otherwise demonstrated what could have been accomplished by more effective cross-examination.

[10]Any error such as bias or false positives in internal proficiency testing would more likely affect the weight of the evidence rather than its admissibility.

expert opinion only if a reliable methodology was so altered as to skew the methodology itself).

Finally, the defendant argues that, even if it was permissible for Dr. Reynolds to give an opinion, she should not have been permitted to testify to the underlying facts and data that formed the basis of that opinion. See *Department of Youth Servs.* v. *A Juvenile*, 398 Mass. at 532 (expert may only be required to disclose these facts or data on cross-examination); *Commonwealth* v. *Jaime*, 433 Mass. 575, 577-578 (2001) (same). Here, while Dr. Reynolds admittedly went beyond giving an opinion and provided a fairly detailed description of the facts and data underlying her opinion, that evidence was cumulative of testimony offered by the defense expert. The facts and data may have, as noted by the defendant, added some .heft to the expert's credibility, but it was not evidence of the type likely to affect the outcome of the trial. Rather, the critical evidence was Dr. Reynolds's properly admitted opinion testimony which permitted the jury to conclude that there was only a one in 160 million chance that someone other than the defendant committed the crime.

*Judgments affirmed.*