## COMMONWEALTH *vs.* MICHAEL DUARTE.

No. 01-P-110.

Essex. May 14, 2002. - December 13, 2002.

Present: DUFFLY, BERRY, & COHEN, JJ.

*Rape. Armed Assault in a Dwelling. Assault and Battery by Means of a Dangerous Weapon. Search and Seizure,* Probable cause, Exigent circumstances. *Deoxyribonucleic Acid. Evidence,* Hearsay, Expert opinion, Scientific test, Statistics. *Practice, Criminal,* Argument by prosecutor, Instructions to jury.

The judge in a criminal action properly denied the defendant's motion to suppress evidence obtained as a result of a warrantless entry into his apartment, where the Commonwealth sustained its burden of showing that the police had probable cause to believe that the defendant had committed the crime under investigation, and that exigent circumstances made it impracticable to obtain a warrant. [716-721]

At the trial of indictments alleging rape of a child by force, armed assault in a dwelling, and assault and battery by means of a dangerous weapon, the judge properly performed his gatekeeper role under *Commonwealth* v. *Lanigan*, 419 Mass. 15, 26 (1994), in ruling that the procedures used by the Commonwealth's DNA testing laboratory were reliable, where, because the testimony of the Commonwealth's witness was derived from her expert knowledge of DNA testing procedures, her review of the analyst's notes, and her knowledge of the training and proficiency testing required of analysts at the laboratory, she was not required to be present at the testing in order to formulate and offer her opinion that the test was properly performed [721-723]; further, the judge was entitled to conclude, in his discretion, that the expert was qualified to render an opinion on population frequency calculations, despite the fact that she was not a population geneticist, given her over-all expertise in the area of DNA testing [723]; and the judge was well warranted in concluding that there was a sufficient showing of reliability to permit the jury to consider the DNA evidence and that the status of a thermometer that may have been overdue for a standardization check went to the weight of the evidence, and not to its admissibility [723-724].

The prosecutor's closing argument at a criminal trial did not misstate his expert's testimony, and the judge's repeated instructions that closing arguments were not evidence would have prevented any imprecision in the prosecutor's remarks from making a difference to the jury. [724-725]

The judge's use of a hypothetical illustration at a criminal trial did not strike too close to the facts in the case, where it was highly unlikely that the jury

would have construed the judge's simple example as an endorsement by the judge of the significance of a piece of evidence in the case, much less as an expression of the judge's belief in the defendant's guilt. [725]

INDICTMENTS found and returned in the Superior Court Department on March 18, 1998.

Pretrial motions to suppress evidence were heard by *Joseph A. Grasso, Jr.*, J., and the cases were tried before *Richard E. Welch, III,* J.

*Debra S. Krupp,* Committee for Public Counsel Services, for the defendant.

*Catherine Langevin Semel,* Assistant District Attorney, for the Commonwealth.

COHEN, J. After a jury trial in the Superior Court, the defendant, Michael Duarte, was convicted of rape of a child by force (G. L. c. 265, § 22A), armed assault in a dwelling (G. L. c. 265, § 18A), and assault and battery by means of a dangerous weapon (G. L. c. 265, § 15A[*b*]). He appeals from these convictions, challenging the denial of his motion to suppress evidence obtained as a result of a warrantless entry into his apartment; the admission of DNA evidence; the propriety of a statement made by the prosecutor during closing argument; and the appropriateness of a hypothetical example used in the judge's charge to the jury. We affirm.

*Background.* The Commonwealth's evidence permitted the jury to find the following facts at trial. In the early morning hours of February 24, 1998, the victim, a thirteen year old girl, was attacked and raped at knifepoint in her home by a male intruder. The victim lived in the first-floor apartment of a three-family house with her mother and her two older brothers. On the night of the rape, the victim's mother was at work, but one of her brothers was at home, asleep in a back bedroom. The victim prepared to go to bed at about 11:00 P.M., turning off all the lights in the apartment and going to sleep in her mother's bedroom at the front of the apartment.

In the middle of the night, the victim woke up to find a man staring at her from the end of the bed. Although there were no lights on in the room, a street light outside provided some il-

lumination through three partially unshaded windows. The victim recognized the intruder as the man who used to live in the third-floor apartment of the house. She also observed the clothing that he was wearing.

The man jumped on top of the victim, threatened her, put a knife to her neck, and covered her mouth. The victim struggled, grabbed the knife by the blade, and threw it aside — resulting in her hand being cut. When the victim tried to get away, she was pulled back. Eventually, the man removed her clothes and had forcible sexual intercourse with her.

The intruder threatened to come back and kill the victim if she told anyone what happened, and ordered her to stay in the bed as he left. After the victim saw him walk down a driveway next to the house, she called her mother at work, told her that she had been raped, and identified the assailant as the man who used to live on the third floor. At that point, it was approximately 5:45 A.M. The victim's mother rushed home, and police were called.

As a result of police activity described below, the defendant was arrested at his home approximately forty-five minutes later. Several items of clothing and a knife were seized from him and later introduced in evidence at trial. Also introduced were statements made by the defendant to the police, and DNA evidence linking the defendant to the crime.

1. *The motion to suppress.* We first address the defendant's contention that his motion to suppress should have been allowed, beginning with a recitation of the pertinent facts found by the motion judge.

On February 24, 1998, at around 6:00 A.M., Officers White and Harkness arrived at the victim's house, where they interviewed the distraught family and noticed that the victim's hand was bleeding. The officers learned that the victim had awakened her brother and told him that Michael Duarte, who had lived upstairs a year earlier, had just raped her. The brother related that he had been in his bedroom when he had seen a male with dark clothing go out the window. He had not seen the man's face, but the man fit the general description of Duarte, whom he knew. The brother described Duarte, told the police

that he believed Duarte now lived nearby, and directed them to Duarte's house.

Officer Harkness accompanied the victim to the hospital, while Officer White remained with her brother and observed the room where the victim had been attacked. The room was in a state of disarray, with the bed sheets torn and bloodied. Shortly thereafter, Officer Harkness radioed Officer White to report that the victim had reiterated that her assailant was Michael Duarte and had said that Duarte had been wearing a black jacket, dark clothes, and a cap.

As a result of the information provided by the victim and her brother, Officer White and two other officers went to the defendant's apartment. It was now approximately 6:30 A.M. When they arrived, they knocked on the door, announcing, "Police." The door was opened by Sabrina Smith, who lived with the defendant together with their young son. When asked about the defendant's whereabouts, Smith stated that he was there with her and that she would go get him, because she had a small child whom she did not want to be awakened. The officers waited in the kitchen while Smith went to get the defendant.

Within a minute, the defendant came into the kitchen fully dressed. He asked why the police were there and was told that he was a suspect in a crime committed earlier that night. The defendant replied that he had been home all night. One of the officers responded by telling the defendant that if that were case, he should not mind if someone came to look at him.

Meanwhile, several other police officers arrived. In all, there were about nine police officers in the kitchen of the defendant's apartment, admitted by the defendant or Smith, after the officers knocked. The officers radioed Sergeant Donnelly to bring the victim's brother to the defendant's apartment. While waiting for him to arrive, the police remained in either the kitchen or the adjoining living room.

The victim's brother arrived within two to three minutes and identified the man in the apartment as the man he knew as Michael Duarte. At that point, the defendant was handcuffed, given his Miranda warnings, and taken into custody. Sergeant Donnelly, who had brought the victim's brother to the scene,

asked the defendant if the police could look around the apartment, and the defendant responded, "Absolutely not."

It had been raining steadily that night — sometimes heavily. Before the defendant was led out of the apartment, one of the officers, Frampton, asked Smith if the defendant had a jacket, as it was cold and rainy (the defendant was dressed only in nylon running pants and a shirt). There was a black jacket, similar to that described by the victim, in plain view in the living room. Smith handed the jacket to Officer Frampton, who passed it to another officer, Sharpe. As he did so, Officer Frampton whispered to Officer Sharpe, "It's damp." Officer Sharpe confirmed this observation prior to putting the jacket over the defendant's shoulders. When they got to the cruiser, Officer Sharpe removed the jacket and took it with him into the front of the cruiser.

During the two- or three-minute ride to the police station with Officers Sharpe and Haggerty, the defendant fidgeted and complained that his handcuffs were too tight. Officer Sharpe then heard a loud thump, as if something had fallen on the floor, after which the defendant stopped fidgeting. When Officer Haggerty escorted the defendant out of the cruiser, he saw a knife on the rear floor of the vehicle and remarked to Officer Sharpe, "I knew he dropped a knife." The defendant then stated, "Don't worry about the knife. It's legal. I bought it the other day."

In the course of booking, the police seized the defendant's sneakers, socks, and nylon running pants. Officer Sharpe retrieved the black jacket from the cruiser and noticed a reddish stain on it. The knife also was retrieved and blood was noted on the blade.

While the defendant was being transported to the police station, two officers remained at his apartment talking to Smith. They told her that the defendant was charged with the rape of a young teenaged girl, to which Smith responded that she could not believe that he would do something like that. The officers asked Smith if the defendant had been home all night. She replied that she had been waiting up for the defendant and heard the door being locked at 3:00 or 3:30 A.M. One of the officers also asked Smith if the defendant owned any black

baseball caps. Smith indicated that he did and walked a few steps to retrieve a black hat that she gave to the officers. The hat was wet. Smith remained cooperative with the police for several days, but became less so as time passed.  ·

On these facts, the motion judge concluded that the Commonwealth had sustained its burden of establishing both of the elements required to justify a warrantless entry into the defendant's dwelling: probable cause to believe the defendant committed the crime under investigation, and exigent circumstances making it impracticable to obtain a warrant. See *Commonwealth* v. *Pietrass*, 392 Mass. 892, 897 (1984). On appeal, the defendant concedes that the judge correctly found that the police had probable cause to arrest him prior to their entry into his home. He claims, however, that the Commonwealth failed to establish any exigency sufficient to obviate the need for a warrant. We disagree.

The exigency exception to the warrant requirement comes into play in cases where there is probable cause, but where taking the time to obtain a warrant would thwart its purpose, because, for example, the suspect may flee, evidence may be destroyed, or danger may be posed to the police or others. See *Commonwealth* v. *Forde*, 367 Mass. 798, 807 (1975); *Commonwealth* v. *Pietrass*, *supra* at 898-899; *Commonwealth* v. *Midi*, 46 Mass. App. Ct. 591, 594 (1999). Whether exigent circumstances may be found depends upon an evaluation of all attendant circumstances as they appeared to the officers at the time of the entry. See *Commonwealth* v. *Young*, 382 Mass. 448, 456 (1981); *Commonwealth* v. *Moore*, 54 Mass. App. Ct. 334, 338 (2002). "Some factors which would tend to support a finding of exigency include: 'a showing that the crime was one of violence or that the suspect was armed, a clear demonstration of probable cause, strong reason to believe that the suspect was in the dwelling, and a likelihood that the suspect would escape if not apprehended. Additional considerations testing the reasonableness of police conduct are whether the entry is peaceable and whether the entry is in the nighttime' " (citations omitted). *Commonwealth* v. *Viriyahiranpaiboon*, 412 Mass. 224, 227 (1992). Not all of these factors need be satisfied to support a finding of exigent circumstances. *Ibid.*

Viewing the present case in light of these principles, we detect no error in the motion judge's conclusion that the Commonwealth sustained its burden of demonstrating exigency. Because the victim knew the assailant and because her brother confirmed the identification by telling police that he saw a person matching the defendant's description climb out the window, there was a strong showing of probable cause. The crimes had just taken place, they were violent, and they were perpetrated with a dangerous weapon. The fact that the suspect was not a stranger to the victim[1] increased the likelihood that he would flee to avoid apprehension or, at a minimum, take prompt action to conceal or cleanse his knife and his clothing, which the police could assume were likely to bear the victim's blood. Delay also would have made it impossible to ascertain from the condition of the defendant's clothing whether he had been outdoors on this very rainy night. The entry was effectuated in the morning, albeit at the early hour of 6:30 A.M.; it was peaceable, and it was accomplished with Smith's acquiescence if not her explicit consent.[2] Finally, once inside the apartment, the police did not act precipitously. They waited until the victim's brother had identified the defendant before placing him under arrest.

The defendant argues that there was a sufficient number of officers available to keep the apartment under surveillance while an arrest warrant was obtained from a nearby court house. Although, in hindsight, this course may have been effective, when we consider the situation from the officers' standpoint at the time of their investigation, we conclude that this was not a practical alternative. The police did not know that the defendant was in the apartment until they knocked on the door and spoke to Smith, at which point she could have "raise[d] the alarm"

---

[1]At the time of the entry into the defendant's apartment, the officers were operating under the assumption that the defendant had no reason to doubt that the victim would be able to identify him. Only later did the police learn that the victim had attempted to protect herself by telling the assailant, untruthfully, that she did not recognize him.

[2]Because we conclude that the motion judge properly could find exigent circumstances, we need not consider the correctness of his alternative ground for decision — that Smith implicitly invited the officers to enter the apartment, as distinct from simply acquiescing in their presence. See generally *Commonwealth* v. *Sanna*, 424 Mass. 92, 97-99 (1997).

had they not taken prompt action. *Commonwealth* v. *Martinez*, 47 Mass. App. Ct. 839, 843 (1999).

Since the police entry into the defendant's apartment was not illegal, the fruits of the entry were not subject to suppression on that basis. Contrast *Commonwealth* v. *Pietrass*, 392 Mass. at 900. Nor does the defendant argue otherwise. In brief, having dropped the knife on the floor of the police cruiser in which he was riding, the defendant "voluntarily surrendered all control over the [knife] in a way which demonstrated that he had relinquished any continued expectation of privacy." *Commonwealth* v. *Straw*, 422 Mass. 756, 759 (1996). The police were thus entitled to seize the knife as abandoned property. *Id.* at 758-759. The clothing the defendant was wearing at the time of his arrest, including the black jacket Smith voluntarily gave to the police, had potential evidentiary value and was properly taken from him. See *Commonwealth* v. *DiBenedetto*, 427 Mass. 414, 417 (1998). Compare *Commonwealth* v. *Street*, 56 Mass. App. Ct. 301, 307-309 (2002).

The statement made by the defendant to the effect that he had been home all night was untainted by any illegality and was voluntarily given at a time when he was not yet in police custody. See *Commonwealth* v. *Morse*, 427 Mass. 117, 122-123 (1998). His statement about the knife was neither the fruit of an unlawful arrest nor the product of custodial interrogation; rather, it was spontaneously volunteered by the defendant after he heard one officer say to the other, "I knew he dropped a knife." See *Commonwealth* v. *Diaz*, 422 Mass. 269, 271 (1996).

As for the black cap, the motion judge justified its seizure based upon Smith's consent or, alternatively, the inevitable discovery doctrine. However, we need not decide whether Smith had authority to tender the hat or if it inevitably would have been discovered had police secured the apartment and obtained a warrant, because we conclude that the seizure and eventual introduction in evidence of the cap was harmless beyond a reasonable doubt in view of the totality of the evidence tending to show the defendant's guilt.

2. *The DNA evidence.* The defendant makes three related arguments in support of his contention that DNA evidence link-

ing him to the crime was erroneously admitted. We address them in turn.

a. *Hearsay evidence about laboratory procedures.* The defendant contends that the judge did not properly perform his gatekeeper role under *Commonwealth* v. *Lanigan,* 419 Mass. 15, 26 (1994), because he ruled, on the basis of hearsay testimony adduced during voir dire of the Commonwealth's DNA expert,[3] that the procedures employed by the testing laboratory were reliable. Acknowledging that the point was not raised below, the defendant maintains that the alleged error created a substantial risk of miscarriage of justice.

In a *Lanigan* hearing, the trial judge is obliged to determine not only that the underlying theory was scientifically valid, but also that the test itself was properly performed. *Commonwealth* v. *McNickles,* 434 Mass. 839, 850 (2001). On the latter prong, the Commonwealth introduced the testimony of Dr. Charlotte Word, the deputy laboratory director of Cellmark Diagnostics Laboratories (Cellmark), the forensic laboratory that performed the testing. Dr. Word did not conduct or observe the testing; however, based upon her review of the testing, she testified that Cellmark's standard operating procedures were followed in this case and were reliable.

The defendant characterizes Dr. Word's testimony as non-opinion testimony relating to Cellmark's methodology, as distinct from opinion testimony relating to the actual results of the DNA testing. Thus, the defendant posits that the rule of *Department of Youth Servs.* v. *A Juvenile,* 398 Mass. 516, 531 (1986), adopted in the context of DNA testimony in *Commonwealth* v. *Sparks,* 433 Mass. 654, 659 (2001), does not apply, and that hearsay testimony could not be used by the Commonwealth on this point.

We conclude, however, that Dr. Word's testimony was, in fact, expert testimony derived from her expert knowledge of DNA testing procedures, her review of the analyst's notes, and her knowledge of the training and proficiency testing required of Cellmark analysts. Accordingly, she was not required to be

---

[3]The judge relied upon both live voir dire testimony and testimony previously given on voir dire before a different judge at an earlier trial in the case, which had resulted in a mistrial.  .

present at the testing in order to formulate and offer her opinion that the test was properly performed.

This result is consistent with our decision in *Commonwealth v. Hill,* 54 Mass. App. Ct. 690, 699-700 (2002). In *Hill,* the defendant claimed, among other things, that he was prejudiced by his inability to conduct a fruitful cross-examination of the Commonwealth's DNA expert (who — like Dr. Word — was not the analyst who performed the testing) about the manner in which the tests were performed. Like the defendant here, the defendant in *Hill* contended that under these circumstances the testing could not be determined to be reliable and could not serve as a basis for the expert's opinion. We rejected that contention in *Hill* and see no reason to take a different approach here. That *Hill* appears to have involved testimony at trial, rather than testimony at a *Lanigan* hearing, is a distinction without a difference. There was no error.

b. *Admission of population frequency statistics.* The defendant also argues that Dr. Word, who was not a population geneticist, was not qualified to testify about population frequency calculations. Given Dr. Word's over-all expertise in the area, however, the judge was entitled to conclude, in his discretion, that she was qualified to render such an opinion in reliance upon statistics professionally available to her. See *Department of Youth Servs.* v. *A Juvenile, supra* at 531-532. We observe, too, that Cellmark's DNA profiling methodology was validated in *Commonwealth* v. *Rosier,* 425 Mass. 807 (1997). Without intimating that, once accepted by our courts, the reliability of particular scientific methodology may never again be challenged, see *Canavan's Case,* 432 Mass. 304, 311 (2000), we perceive no prejudice to the defendant from the use of databases and population frequency calculations that were so recently scrutinized and approved by our courts.

c. *Reliability of thermometer used in testing.* The defendant also contends that the use of a thermometer that may have been overdue for a standardization check rendered the DNA analysis unreliable and inadmissible. Even if we were to assume that the defendant's motion to strike at trial was adequate to preserve

this issue,[4] we think the judge was well warranted in concluding that there was a sufficient showing of reliability to permit the jury to consider the DNA evidence and that the status of the thermometer went to the weight of the evidence, and not to its admissibility.

There is no hard and fast rule that any deviation or deficiency in laboratory procedure, irrespective of its significance, requires the exclusion of scientific testimony. Depending upon the nature of the claimed deficiency, the judge nevertheless may draw the conclusion that the evidence is sufficiently reliable to go to the jury, to be considered along with any evidence of imperfections that is developed by the opposing party. See *Commonwealth* v. *McNickles*, 434 Mass. at 850.

Here, there was scant evidence that the thermometer used by Cellmark caused its testing to be unreliable. The defendant's expert testified to the importance of an accurately calibrated thermometer to insure the proper temperature of the water used in the testing and stated that, while observing at Cellmark, he noticed a date sticker suggesting that the thermometer used in this case may have been a few weeks overdue for a check. However, the defendant offered no proof that the thermometer, in fact, was inaccurate. On the other hand, Dr. Word testified that if the temperature of the water used in the testing had been too hot or too cold, there would have been discernible abnormalities in the results, and that she saw nothing of the kind in this case. On this record, the judge was entitled to conclude in his discretion that the question raised by the defense about the status of the thermometer did not require him to keep the DNA evidence from the jury.

3. *Prosecutor's argument.* The defendant challenges a small segment of the prosecutor's closing argument, objected to at trial, claiming that the argument mischaracterized the prosecutor's expert's testimony by suggesting that the prosecutor agreed with Dr. Word that sample degradation due to bad storage necessarily would have manifested itself to the analyst. We think the comment falls short of misstatement. In any event, we can

---

[4]The issue was not raised by pretrial motion as required by *Commonwealth* v. *Sparks*, 433 Mass. at 659. The defense mentioned the issue during voir dire, but did not introduce evidence on the point at that time.

presume that the judge's repeated instructions that closing arguments were not evidence would have prevented any imprecision in the prosecutor's remarks from making a difference to the jury. See *Commonwealth* v. *Pearce*, 427 Mass. 642, 645 (1998).

4. *Hypothetical illustration in charge to jury.* The defendant's final contention is that the judge gave a hypothetical illustration of circumstantial evidence that struck too close to the facts of this case. See generally *Commonwealth* v. *Fisher*, 433 Mass. 340, 346 (2001). The judge used the example of a court officer leaving to get lunch for the jury and returning, half an hour later, with a box of sandwiches and a wet coat and umbrella. The judge explained that on these facts the jury could, but were not required, to draw the conclusion that it was raining outside.

We think it highly unlikely that the jury would have construed this simple example as an endorsement by the judge of the evidentiary significance of the defendant's wet clothes, much less as an expression of the judge's belief in the defendant's guilt.[5] The hypothetical illustration created no reversible error.

*Judgments affirmed.*

---

[5]The defendant's wet clothes assumed relatively little importance at trial, since there was strong direct evidence establishing that the defendant was not at home on the night of the rape, including the testimony of a friend that he and the defendant were out together until after 3:00 A.M.