Justice Alito,
with whom Justice Kennedy joins, and with whom Justice Thomas joins as to Part II, concurring.
Respondent was convicted for a brutal sexual assault. At trial, the defense declined to have DNA testing done on a semen sample found at the scene of the crime. Defense counsel explained that this decision was made based on fear that the testing would provide further evidence of respondent’s guilt. After conviction, in an unsuccessful attempt to obtain parole, respondent confessed in detail to the crime. Now, respondent claims that he has a federal constitutional right to test the sample and that he can go directly to federal court to obtain this relief without giving the Alaska courts-a full opportunity to consider his claim.
I agree with the Court’s resolution of respondent’s constitutional claim. In my view, that claim also fails for two independent reasons beyond those given by the majority. First, a state prisoner asserting a federal constitutional right to perform such testing must file a petition for a writ of habeas corpus, not an action under Rev. Stat. § 1979,42 U. S. C. § 1983, as respondent did here, and thus must exhaust state remedies, see 28 U. S. C. § 2254(b)(1)(A). Second, even though respondent did not exhaust his state remedies, his claim may be rejected on the merits, see § 2254(b)(2), because *76 a defendant who declines the opportunity to perform DNA testing at trial for tactical reasons has no constitutional right to perform such testing after conviction.
I
As our prior opinions illustrate, it is sometimes difficult to draw the line between claims that are properly brought in habeas and those that may be brought under 42 U. S. C. § 1983. See Preiser v. Rodriguez, 411 U. S. 475 (1973); Heck v. Humphrey, 512 U. S. 477 (1994); Wilkinson v. Dotson, 544 U. S. 74 (2005). But I think that this case falls on the habeas side of the line.
We have long recognized the principles of federalism and comity at stake when state prisoners attempt to use the federal courts to attack their final convictions. See, e. g., Darr v. Burford, 339 U. S. 200, 204 (1950); Braden v. 30th Judicial Circuit Court of Ky., 410 U. S. 484, 490-491 (1973); Preiser, supra, at 491-492; Rose v. Lundy, 455 U. S. 509, 518-519 (1982); Rhines v. Weber, 544 U. S. 269, 273-274 (2005). We accordingly held that “ ‘it would be unseemly in our dual system of government for a federal district court to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation.’ ” Dandy, supra, at 518 (quoting Darr, supra, at 204). Congress subsequently codified Dandy’s exhaustion requirement in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U. S. C. § 2254(b)(1)(A).
We also have long recognized the need to impose sharp limits on state prisoners’ efforts to bypass state courts with their discovery requests. See, e. g., Wainwright v. Sykes, 433 U. S. 72, 87-90 (1977); Keeney v. Tamayo-Reyes, 504 U. S. 1, 8-10 (1992); Williams v. Taylor, 529 U. S. 420, 436 (2000). For example, we have held that “concerns of finality, comity, judicial economy, and channeling the resolution of claims into the most appropriate forum” require a state prisoner to show “cause-and-prejudice” before asking a federal habeas court *77 to hold an evidentiary hearing. Keeney, supra, at 8. That result reduces opportunities for “ ‘sandbagging’ on the part of defense lawyers,” Sykes, supra, at 89, and it “reduces the ‘inevitable friction’ that results when a federal habeas court ‘overturns either the factual or legal conclusions reached by the state-court system,’” Keeney, supra, at 9 (quoting Sumner v. Mata, 449 U. S. 539, 550 (1981); brackets omitted). Congress subsequently codified Keeney’s cause-and-prejudice rule in AEDPA, 28 U. S. C. § 2254(e)(2).
The rules set forth in our cases and codified in AEDPA would mean very little if state prisoners could simply evade them through artful pleading. For example, I take it as common ground that a state prisoner’s claim under Brady v. Maryland, 373 U. S. 83 (1963), must be brought in habeas because that claim, if proved, would invalidate the judgment of conviction or sentence (and thus the lawfulness of the inmate’s confinement). See Heck, supra, at 481. But under respondent’s view, I see no reason why a Brady claimant could not bypass the state courts and file a § 1983 claim in federal court, contending that he has a due process right to search the State’s files for exculpatory evidence. Allowing such a maneuver would violate the principles embodied in Lundy, Keeney, and AEDPA.
Although respondent has now recharacterized his claim in an effort to escape the requirement of proceeding in habeas, in his complaint he squarely alleged that the State “deprived [him] of access to exculpatory evidence in violation of Brady[, supra], and the Due Process Clause of the Fourteenth Amendment to the U. S. Constitution.” App. 37. That allegedly “exculpatory” evidence — which Brady defines as “evidence favorable to [the] accused” and “material either to guilt or to punishment,” 373 U. S., at 87 — would, by definition, undermine respondent’s “guilt” or “punishment” if his allegations are true. Such claims should be brought in habeas, see Heck, supra, at 481, and respondent cannot avoid *78 that result by attempting to bring his claim under § 1983, see Dotson, supra, at 92 (Kennedy, J., dissenting).[1]
It is no answer to say, as respondent does, that he simply wants to use § 1983 as a discovery tool to lay the foundation for a future state postconviction application, a state clemency petition, or a request for relief by means of “prosecutorial consent.” See Brief for Respondent 23. Such tactics implicate precisely the same federalism and comity concerns that motivated our decisions (and Congress’) to impose exhaustion requirements and discovery limits in federal habeas proceedings. If a petitioner can evade the habeas statute’s exhaustion requirements in this way, I see no reason why a state prisoner asserting an ordinary Brady claim — i. e., a state prisoner who claims that the prosecution failed to turn over exculpatory evidence prior to trial — could not follow the same course.
What respondent seeks was accurately described in his complaint — the discovery of evidence that has a material bearing on his conviction. Such a claim falls within “the core” of habeas. Preiser, supra, at 489. Recognition of a constitutional right to postconviction scientific testing of evidence in the possession of the prosecution would represent an expansion of Brady and a broadening of the discovery rights now available to habeas petitioners. See 28 U. S. C. § 2254 Rule 6. We have never previously held that a state prisoner may seek discovery by means of a §1983 action, *79 and we should not take that step here. I would hold that respondent’s claim (like all other Brady claims) should be brought in habeas.
II
The principles of federalism, comity, and finality are not the only ones at stake for the State in cases like this one. To the contrary, DNA evidence creates special opportunities, risks, and burdens that implicate important state interests. Given those interests — and especially in light of the rapidly evolving nature of DNA testing technology — this is an area that should be (and is being) explored “through the workings of normal democratic processes in the laboratories of the States.” Atkins v. Virginia, 536 U. S. 304, 326 (2002) (Rehnquist, C. J., dissenting).[2]
*80 A
As the Court notes, DNA testing often produces highly reliable results. See ante, at 62. Indeed, short tandem repeat (STR) “DNA tests can, in certain circumstances, establish to a virtual certainty whether a given individual did or did not commit a particular crime.” Harvey v. Horan, 285 F. 3d 298, 305 (CA4 2002) (Luttig, J., respecting denial of rehearing en banc). Because of that potential for “virtual certainty,” Justice Stevens argues that the State should welcome respondent’s offer to perform modern DNA testing (at his own expense) on the State’s DNA evidence; the test will either confirm respondent’s guilt (in which case the State has lost nothing) or exonerate him (in which case the State has no valid interest in detaining him). See post, at 97-98.
Alas, it is far from that simple. First, DNA testing — even when performed with modern STR technology, and even when performed in perfect accordance with protocols — often *81 fails to provide “absolute proof” of anything. Post, at 98 (Stevens, J., dissenting). As one scholar has observed:
“[F]orensic DNA testing rarely occurs [under] idyllic conditions. Crime scene DNA samples do not come from a single source obtained in immaculate conditions; they are messy assortments of multiple unknown persons, often collected in the most difficult conditions. The samples can be of poor quality due to exposure to heat, light, moisture, or other degrading elements. They can be of minimal or insufficient quantity, especially as investigators push DNA testing to its limits and seek profiles from a few cells retrieved from cigarette butts, envelopes, or soda cans. And most importantly, forensic samples often constitute a mixture of multiple persons, such that it is not clear whose profile is whose, or even how many profiles are in the sample at all. All of these factors make DNA testing in the forensic context far more subjective than simply reporting test results ....” Murphy, The Art in the Science of DNA: A Layperson’s Guide to the Subjectivity Inherent in Forensic DNA Typing, 58 Emory L. J. 489, 497 (2008) (footnotes omitted).
See also R. Michaelis, R. Flanders, & P. Wulff, A Litigator’s Guide to DNA 341 (2008) (hereinafter Michaelis) (noting that even “STR analyses are plagued by issues of suboptimal samples, equipment malfunctions and human error, just as any other type of forensic DNA test”); Harvey v. Horan, 278 F. 3d 370, 383, n. 4 (CA4 2002) (King, J., concurring in part and concurring in judgment) (noting that the first STR DNA test performed under Virginia’s postconviction DNA access statute was inconclusive). Such concerns apply with particular force where, as here, the sample is minuscule, it may contain three or more persons’ DNA, and it may have degraded significantly during the 24 or more hours it took police to recover it.
*82 Second, the State has important interests in maintaining the integrity of its evidence, and the risks associated with evidence contamination increase every time someone attempts to extract new DNA from a sample. According to Professor John Butler — who is said to have written “the canonical text on forensic DNA typing,” Murphy, supra, at 493, n. 16 — “[t]he extraction process is probably where the DNA sample is more susceptible to contamination in the laboratory than at any other time in the forensic DNA analysis process,” J. Butler, Forensic DNA Typing 42 (2d ed. 2005).
Indeed, modern DNA testing technology is so powerful that it actually increases the risks associated with mishandling evidence. STR tests, for example, are so sensitive that they can detect DNA transferred from person X to a towel (with which he wipes his face), from the towel to Y (who subsequently wipes his face), and from Y’s face to a murder weapon later wielded by Z (who can use STR technology to blame X for the murder). See Michaelis 62-64; Thompson, Ford, Doom, Raymer, & Krane, Evaluating Forensic DNA Evidence: Essential Elements of a Competent Defense Review (Part 2), The Champion, May 2003, pp. 25-26. Any test that is sensitive enough to pick up such trace amounts of DNA will be able .to detect even the slightest, unintentional mishandling of evidence. See Michaelis 63 (cautioning against mishandling evidence because “two research groups have already demonstrated the ability to obtain STR profiles from fingerprints on paper or evidence objects”). And that is to say nothing of the intentional DNA-evidence-tampering scandals that have surfaced in recent years. See, e. g., Murphy, The New Forensics: Criminal Justice, False Certainty, and the Second Generation of Scientific Evidence, 95 Cal. L. Rev. 721, 772-773 (2007) (collecting examples). It gives short shrift to such risks to suggest that anyone — including respondent, who has twice confessed to his crime, has never recanted, and passed up the opportunity for DNA testing at trial — should be given a never- *83 before-recognized constitutional right to rummage through the State’s genetic-evidence locker.
Third, even if every test was guaranteed to provide a conclusive answer, and even if no one ever contaminated a DNA sample, that still would not justify disregarding the other costs associated with the DNA access regime proposed by respondent. As the Court notes, recognizing a prisoner’s freestanding right to access the State’s DNA evidence would raise numerous policy questions, not the least of which is whether and to what extent the State is constitutionally obligated to collect and preserve such evidence. See ante, at 73-74. But the policy problems do not end there.
Even without our creation and imposition of a mandatory-DNA-access regime, state crime labs are already responsible for maintaining and controlling hundreds of thousands of new DNA samples every year. For example, in the year 2005, the State of North Carolina processed DNA samples in approximately 1,900 cases, while the Commonwealth of Virginia processed twice as many. See Office of State Budget and Management, Cost Study of DNA Testing and Analysis As Directed by Session Law 2005-267, Section 15.8, pp. 5, 8 (Mar. 1, 2006) (hereinafter North Carolina Study), http://www.osbm.state.nc.us/files/pdf_files/3-l-2006FinalDNA Report.pdf (all Internet materials as visited June 16, 2009, and available in Clerk of Court’s case file); see also id., at 8 (noting that the State of Iowa processed DNA samples in 1,500 eases in that year). Each case often entails many separate DNA samples. See Wisconsin Criminal Justice Study Commission, Position Paper: Decreasing the Turnaround Time for DNA Testing, p. 2 (hereinafter Wisconsin Study), http://www.wcjsc.org/WCJSC_Report_on_DNA_Backlog.pdf (“An average case consists of 8 samples”). And these data— which are now four years out of date — dramatically underestimate the States’ current DNA-related caseloads, which expand at an average annual rate of around 24%. See Wisconsin Dept, of Justice, Review of State Crime Lab Re *84 sources for DNA Analysis 6 (Feb. 12, 2007), http://www.doj. state. wi.us/news/files/dnaanalysisplan.pdf.
The resources required to process and analyze these hundreds of thousands of samples have created severe backlogs in state crime labs across the country. For example, the State of Wisconsin reports that it receives roughly 17,600 DNA samples per year, but its labs can process only 9,600. Wisconsin Study 2. Similarly, the State of North Carolina reports that “[i]t is not unusual for the [State] Crime Lab to have several thousand samples waiting to be outsourced due to the federal procedures for [the State’s] grant. This is not unique to North Carolina but a national issue.” North Carolina Study 9.
The procedures that the state labs use to handle these hundreds of thousands of DNA samples provide fertile ground for litigation. For example, in Commonwealth v. Duarte, 56 Mass. App. 714, 723, 780 N. E. 2d 99, 106 (2002), the defendant argued that “the use of a thermometer that may have been overdue for a standardization check rendered the DNA analysis unreliable and inadmissible” in his trial for raping a 13-year-old girl. The court rejected that argument and held “that the status of the thermometer went to the weight of the evidence, and not to its admissibility,” id., at 724, 780 N. E. 2d, at 106, and the court ultimately upheld Duarte’s conviction after reviewing the testimony of the deputy director of the laboratory that the Commonwealth used for the DNA tests, see ibid. But the case nevertheless illustrates “that no detail of laboratory operation, no matter how minute, is exempt as a potential point on which a defense attorney will question the DNA evidence.” Michaelis 68; see also id., at 68-69 (discussing the policy implications of Duarte).
My point in recounting the burdens that postconviction DNA testing imposes on the Federal Government and the States is not to denigrate the importance of such testing. Instead, my point is that requests for postconviction DNA testing are not cost free. The Federal Government and the *85 States have a substantial interest in the implementation of rules that regulate such testing in a way that harnesses the unique power of DNA testing while also respecting the important governmental interests noted above. The Federal Government and the States have moved expeditiously to enact rules that attempt to perform this role. And as the Court holds, it would be most unwise for this Court, wielding the blunt instrument of due process, to interfere prematurely with these efforts.
B
I see no reason for such intervention in the present case. When a criminal defendant, for tactical purposes, passes up the opportunity for DNA testing at trial, that defendant, in my judgment, has no constitutional right to demand to perform DNA testing after conviction. Recognition of such a right would allow defendants to play games with the criminal justice system. A guilty defendant could forgo DNA testing at trial for fear that the results would confirm his guilt, and in the hope that the other evidence would be insufficient to persuade the jury to find him guilty. Then, after conviction, with nothing to lose, the defendant could demand DNA testing in the hope that some happy accident — for example, degradation or contamination of the evidence — would provide the basis for seeking postconviction relief. Denying the opportunity for such an attempt to game the criminal justice system should not shock the conscience of the Court.
There is ample evidence in this case that respondent attempted to game the system. At trial, respondent’s lawyer made an explicit, tactical decision to forgo restriction-fragment-length-polymorphism (RFLP) testing in favor of less reliable DQ Alpha testing. Having forgone more accurate DNA testing once before, respondent’s reasons for seeking it now are suspect. It is true that the STR testing respondent now seeks is even more advanced than the RFLP testing he declined — but his counsel did not decline RFLP testing because she thought it was not good enough; she de *86 dined because she thought it was too good. Osborne I, 110 P. 3d 986,990 (Alaska App. 2005). “[A] defendant should not be allowed to take a gambler’s risk and complain only if the cards [fall] the wrong way.” Osborne v. State, 163 P. 3d 973, 984 (Alaska App. 2007) (Mannheimer, J., concurring) (internal quotation marks omitted).
Justice Stevens contends that respondent should not be bound by his attorney’s tactical decision and notes that respondent testified in the state postconviction proceeding that he strongly objected to his attorney’s strategy. See post, at 97-98, n. 8. His attorney, however, had no memory of that objection, and the state court did not find that respondent’s testimony was truthful.[3] Nor do we have reason to assume that respondent was telling the truth, particularly since he now claims that he lied at his parole hearing when he twice confessed to the crimes for which he was convicted.
In any event, even assuming for the sake of argument that respondent did object at trial to his attorney’s strategy, it is a well-accepted principle that, except in a few carefully defined circumstances, a criminal defendant is bound by his attorney’s tactical decisions unless the attorney provided constitutionally ineffective assistance. See Vermont v. Britton, 556 U. S. 81, 90-91 (2009).[4] Here, the state postconviction *87 court rejected respondent’s ineffective-assistance claim, Osborne I, swpra, at 991-992; respondent does not challenge that holding; and we must therefore proceed on the assumption that his attorney’s decision was reasonable and binding.[5]
* *
If a state prisoner wants to challenge the State’s refusal to permit postconviction DNA testing, the prisoner should proceed under the habeas statute, which duly accounts for the interests of federalism, comity, and finality. And in considering the merits of such a claim, the State’s weighty interests cannot be summarily dismissed as “ ‘arbitrary, or conscience shocking.’ ” Post, at 96-97 (Stevens, J., dissenting). With these observations, I join the opinion of the Court.
Justice Stevens, with whom Justice Ginsburg and Justice Breyer join, and with whom Justice Souter joins as to Part I, dissenting.
The State of Alaska possesses physical evidence that, if tested, will conclusively establish whether respondent William Osborne committed rape and attempted murder. If he did, justice has been served by his conviction and sentence. If not, Osborne has needlessly spent decades behind bars while the true culprit has not been brought to justice. The DNA test Osborne seeks is a simple one, its cost modest, and *88 its results uniquely precise. Yet for reasons the State has been unable or unwilling to articulate, it refuses to allow Osborne to test the evidence at his own expense and to thereby ascertain the truth once and for all.
On two equally problematic grounds, the Court today blesses the State’s arbitrary denial of the evidence Osborne seeks. First, while acknowledging that Osborne may have a due process right to access the evidence under Alaska’s postconviction procedures, the Court concludes that Osborne has not yet availed himself of all possible avenues for relief in state court.[1] As both a legal and factual matter, that conclusion is highly suspect. More troubling still, based on a fundamental mischaracterization of the right to liberty that Osborne seeks to vindicate, the Court refuses to acknowledge “in the circumstances of this case” any right to access the evidence that is grounded in the Due Process Clause itself. Because I am convinced that Osborne has a constitutional right of access to the evidence he wishes to test and that, on the facts of this case, he has made a sufficient showing of entitlement to that evidence, I would affirm the decision of the Court of Appeals.
I
The Fourteenth Amendment provides that “[n]o State shall... deprive any person of life, liberty, or property, without due process of law.” § 1. Our cases have frequently *89 recognized that protected liberty interests may arise “from the Constitution itself, by reason of guarantees implicit in the word ‘liberty,'... or it may arise from an expectation or interest created by state laws or policies.” Wilkinson v. Austin, 545 U. S. 209, 221 (2005). Osborne contends that he possesses a right to access DNA evidence arising from both these sources.
Osborne first anchors his due process right in Alaska Stat. §12.72.010(4) (2008). Under that provision, a person who has been “convicted of, or sentenced for, a crime may institute a proceeding for post-conviction relief if the person claims . . . that there exists evidence of material facts, not previously presented and heard by the court, that requires vacation of the conviction or sentence in the interest of justice.” Ibid.[2] Osborne asserts that exculpatory DNA test results obtained using state-of-the-art Short Tandem Repeat (STR) and Mitochondrial (mtDNA) analysis would qualify as newly discovered evidence entitling him to relief under the state statute. The problem is that the newly discovered evidence he wishes to present cannot be generated unless he is first able to access the State’s evidence — something he cannot do without the State’s consent or a court order.
Although States are under no obligation to provide mechanisms for postconviction relief, when they choose to do so, the procedures they employ must comport with the demands of the Due Process Clause, see Evitts v. Lucey, 469 U. S. 387, 393 (1985), by providing litigants with fair opportunity to *90 assert their state-created rights. Osborne contends that by denying him an opportunity to access the physical evidence, the State has denied him meaningful access to state postconviction relief, thereby violating his right to due process.
Although the majority readily agrees that Osborne has a protected liberty interest in demonstrating his innocence with new evidence under Alaska Stat. §12.72.010(4), see ante, at 68, it rejects the Ninth Circuit’s conclusion that Osborne is constitutionally entitled to access the State’s evidence. The Court concludes that the adequacy of the process afforded to Osborne must be assessed under the standard set forth in Medina v. California, 505 U. S. 437 (1992). Under that standard, Alaska’s procedures for bringing a claim under §12.72.010(4) will not be found to violate due process unless they “ "'ffen[d] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental,’ or 'transgres[s] any recognized principle of fundamental fairness in operation.’” Ante, at 69 (quoting Medina, 505 U. S., at 446, 448).[3] After conducting a cursory review of the relevant statutory text, the Court concludes that Alaska’s procedures are constitutional on their face.
While I agree that the statute is not facially deficient, the state courts’ application of § 12.72.010(4) raises serious questions whether the State’s procedures are fundamentally unfair in their operation. As an initial matter, it is not clear that Alaskan courts ordinarily permit litigants to utilize the state postconviction statute to obtain new evidence in the form of DNA tests. The majority assumes that such discov *91 ery is possible based on a single, unpublished, nonprecedential decision from the Alaska Court of Appeals, see ante, at 70 (citing Patterson v. State, No. A-8814, 2006 WL 573797 (Mar. 8, 2006)), but the State concedes that no litigant yet has obtained evidence for such testing under the statute.[4]
Of even greater concern is the manner in which the state courts applied § 12.72.010(4) to the facts of this case. In determining that Osborne was not entitled to relief under the postconviction statute, the Alaska Court of Appeals concluded that the DNA testing Osborne wished to obtain could not qualify as “newly discovered” because it was available at the time of trial. See Osborne v. State, 110 P. 3d 986, 992 (2005) (Osborne I). In his arguments before the state trial court and his briefs to the Alaska Court of Appeals, however, Osborne had plainly requested STR DNA testing, a form of DNA testing not yet in use at the time of his trial. See App. 171, 175; see also 521 F. 3d 1118, 1123, n. 2 (CA9 2008). The state appellate court’s conclusion that the requested testing had been available at the time of trial was therefore clearly erroneous.[5] Given these facts, the majority’s assertion that Osborne “attempted] to sidestep state process” by failing “to use the process provided to him by the State” is unwarranted. Ante, at 70, 71.
The same holds true with respect to the majority’s suggestion that the Alaska Constitution might provide additional protections to Osborne above and beyond those afforded under § 12.72.010(4). In Osborne’s state postconviction proceedings, the Alaska Court of Appeals held out the possibil *92 ity that even when evidence does not meet the requirements of § 12.72.010(4), the State Constitution might offer relief to a defendant who is able to make certain threshold showings. See Osborne I, 110 P. 3d, at 995-996. On remand from that decision, however, the state trial court denied Osborne relief on the ground that he failed to show that (1) his conviction rested primarily on eyewitness identification; (2) there was a demonstrable doubt concerning his identity as the perpetrator; and (3) scientific testing would likely be conclusive on this issue. Osborne v. State, 163 P. 3d 973, 979-981 (Alaska App. 2007). The first two reasons reduce to an evaluation of the strength of the prosecution’s original case — a consideration that carries little weight when balanced against evidence as powerfully dispositive as an exculpatory DNA test. The final reason offered by the state court — that further testing would not be conclusive on the issue of Osborne’s guilt or innocence — is surely a relevant factor in deciding whether to release evidence for DNA testing. Nevertheless, the state court’s conclusion that such testing would not be conclusive in this case is indefensible, as evidenced by the State’s recent concession on that point. See also 521 F. 3d, at 1136-1139 (detailing why the facts of this case do not permit an inference that any exonerating test result would be less than conclusive).
Osborne made full use of available state procedures in his efforts to secure access to evidence for DNA testing so that he might avail himself of the postconviction relief afforded by the State of Alaska. He was rebuffed at every turn. The manner in which the Alaska courts applied state law in this case leaves me in grave doubt about the adequacy of the procedural protections afforded to litigants under Alaska Stat. § 12.72.010(4), and provides strong reason to doubt the majority’s flippant assertion that if Osborne were “simply [to] see[k] the DNA through the State’s discovery procedures, he might well get it.” Ante, at 71. However, even *93 if the Court were correct in its assumption that Osborne might be given the evidence he seeks were he to present his claim in state court a second time, there should be no need for him to do so.
II
Wholly apart from his state-created interest in obtaining postconvietion relief under Alaska Stat. §12.72.010(4), Osborne asserts a right to access the State’s evidence that derives from the Due Process Clause itself. Whether framed as a “substantive liberty interest . . . protected through a procedural due process right” to have evidence made available for testing, or as a substantive due process right to be free of arbitrary government action, see Harvey v. Horan, 285 F. 3d 298, 315, 319 (CA4 2002) (Luttig, J., respecting denial of rehearing en banc),[6] the result is the same: On the record now before us, Osborne has established his entitlement to test the State’s evidence.
The liberty protected by the Due Process Clause is not a creation of the Bill of Rights. Indeed, our Nation has long recognized that the liberty safeguarded by the Constitution has far deeper roots. See Declaration of Independence ¶ 2 (holding it self-evident that “all men are . . . endowed by their Creator with certain unalienable Rights,” among which are “Life, Liberty, and the pursuit of Happiness”); see also Meachum v. Fano, 427 U. S. 215, 230 (1976) (Stevens, J., dissenting). The “most elemental” of the liberties protected by the Due Process Clause is “the interest in being free from physical detention by one’s own government.” Hamdi v. Rumsfeld, 542 U. S. 507, 529 (2004) (plurality opinion); see Foucha v. Louisiana, 504 U. S. 71, 80 (1992) (“Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause”).
*94 Although a valid criminal conviction justifies punitive detention, it does not entirely eliminate the liberty interests of convicted persons. For while a prisoner’s “rights may be diminished by the needs and exigencies of the institutional environment, . . . [t]here is no iron curtain drawn between the Constitution and the prisons of this country.” Wolff v. McDonnell, 418 U. S. 539, 555-556 (1974); Shaw v. Murphy, 532 U. S. 223, 228-229 (2001) (“[I]ncarceration does not divest prisoners of all constitutional protections”). Our cases have recognized protected interests in a variety of postconviction contexts, extending substantive constitutional protections to state prisoners on the premise that the Due Process Clause of the Fourteenth Amendment requires States to respect certain fundamental liberties in the postconviction context. See, e. g., Thornburgh v. Abbott, 490 U. S. 401, 407 (1989) (right to free speech); Turner v. Safley, 482 U. S. 78, 84 (1987) (right to marry); Cruz v. Beto, 405 U. S. 319, 322 (1972) (per curiam) (right to free exercise of religion); Lee v. Washington, 390 U. S. 333 (1968) (per curiam) (right to be free of racial discrimination); Johnson v. Avery, 393 U. S. 483 (1969) (right to petition government for redress of grievances). It is therefore far too late in the day to question the basic proposition that convicted persons such as Osborne retain a constitutionally protected measure of interest in liberty, including the fundamental liberty of freedom from physical restraint.
Recognition of this right draws strength from the fact that 46 States and the Federal Government have passed statutes providing access to evidence for DNA testing, and 3 additional States (including Alaska) provide similar access through court-made rules alone, see Brief for State of California et al. as Amici Curiae 3-4, n. 1, and 2; ante, at 62-63 (opinion of the Court). These legislative developments are consistent with recent trends in legal ethics recognizing that prosecutors are obliged to disclose all forms of exculpatory evidence that come into their possession following convic *95 tion. See, e. g., ABA Model Rules of Professional Conduct 3.8(g)-(h) (2008); see also Imbler v. Pachtman, 424 U. S. 409, 427, n. 25 (1976) (“[Ajfter a conviction the prosecutor also is bound by the ethics of his office to inform the appropriate authority of after-acquired or other information that casts doubt upon the correctness of the conviction”). The fact that nearly all the States have now recognized some postconviction right to DNA evidence makes it more, not less, appropriate to recognize a limited federal right to such evidence in cases where litigants are unfairly barred from obtaining relief in state court.
Insofar as it is process Osborne seeks, he is surely entitled to less than “the full panoply of rights” that would be due a criminal defendant prior to conviction, see Morrissey v. Brewer, 408 U. S. 471, 480 (1972). That does not mean, however, that our pretrial due process cases have no relevance in the postconviction context. In Brady v. Maryland, 373 U. S. 83, 87 (1963), we held that the State violates due process when it suppresses “evidence favorable to an accused” that is “material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.” Although Brady does not directly provide for a postconviction right to such evidence, the concerns with fundamental fairness that motivated our decision in that case are equally present when convicted persons such as Osborne seek access to dispositive DNA evidence following conviction.
Recent scientific advances in DNA analysis have made “it literally possible to confirm guilt or innocence beyond any question whatsoever, at least in some categories of cases.” Harvey, 285 F. 3d, at 305 (Luttig, J.). As the Court recognizes today, the powerful new evidence that modern DNA testing can provide is “unlike anything known before.” Ante, at 62. Discussing these important forensic developments in his oft-cited opinion in Harvey, Judge Luttig explained that although “no one would contend that fairness, in the constitutional sense, requires a post-conviction right *96 of access or a right to disclosure anything approaching in scope that which is required pre-trial,” in cases “where the government holds previously-produced forensic evidence, the testing of which concededly could prove beyond any doubt that the defendant did not commit the crime for which he was convicted, the very same principle of elemental fairness that dictates pre-trial production of all potentially exculpatory evidence dictates post-trial production of this infinitely narrower category of evidence.” 285 F. 3d, at 317. It does so “out of recognition of the same systemic interests in fairness and ultimate truth.” Ibid.
Observing that the DNA evidence in this ease would be so probative of Osborne’s guilt or innocence that it exceeds the materiality standard that governs the disclosure of evidence under Brady, the Ninth Circuit granted Osborne’s request for access to the State’s evidence. See 521 F. 3d, at 1134. In doing so, the Court of Appeals recognized that Osborne possesses a narrow right of postconviction access to biological evidence for DNA testing “where [such] evidence was used to secure his conviction, the DNA testing is to be conducted using methods that were unavailable at the time of trial and are far more precise than the methods that were then available, such methods are capable of conclusively determining whether Osborne is the source of the genetic material, the testing can be conducted without cost or prejudice to the State, and the evidence is material to available forms of post-conviction relief.” Id., at 1142. That conclusion does not merit reversal.
If the right Osborne seeks to vindicate is framed as purely substantive, the proper result is no less clear. “The touchstone of due process is protection of the individual against arbitrary action of government,” Meachum, 427 U. S., at 226 (internal quotation marks omitted); Wolff, 418 U. S., at 558; County of Sacramento v. Lewis, 523 U. S. 833, 845-846 (1998). When government action is so lacking in justification that it “can properly be characterized as arbitrary, or *97 conscience shocking, in a constitutional sense,” Collins v. Harker Heights, 508 U. S. 115, 128 (1992), it violates the Due Process Clause. In my view, the State’s refusal to provide Osborne with access to evidence for DNA testing qualifies as arbitrary.
Throughout the course of state and federal litigation, the State has failed to provide any concrete reason for denying Osborne the DNA testing he seeks, and none is apparent. Because Osborne has offered to pay for the tests, cost is not a factor. And as the State now concedes, there is no reason to doubt that such testing would provide conclusive confirmation of Osborne’s guilt or revelation of his innocence.[7] In the courts below, the State refused to provide an explanation for its refusal to permit testing of the evidence, see Brief for Respondent 33, and in this Court, its explanation has been, at best, unclear. Insofar as the State has articulated any reason at all, it appears to be a generalized interest in protecting the finality of the judgment of conviction from any possible future attacks. See Brief for Petitioners 18, 50.[8]
*98 While we have long recognized that States have an interest in securing the finality of their judgments, see, e. g., Duncan v. Walker, 583 U. S. 167, 179 (2001); Teague v. Lane, 489 U. S. 288, 309 (1989) (plurality opinion); McCleskey v. Zant, 499 U. S. 467, 491-492 (1991), finality is not a stand-alone value that trumps a State’s overriding interest in ensuring that justice is done in its courts and secured to its citizens. Indeed, when absolute proof of innocence is readily at hand, a State should not shrink from the possibility that error may have occurred. Rather, our system of justice is strengthened by “recognizing] the need for, and imperative of, a safety valve in those rare instances where objective proof that the convicted actually did not commit the offense later becomes available through the progress of science.” Harvey, 285 F. 3d, at 306 (Luttig, J.). DNA evidence has led to an extraordinary series of exonerations, not only in cases where the trial evidence was weak, but also in cases where the convicted parties confessed their guilt and where the *99 trial evidence against them appeared overwhelming.[9] The examples provided by amici of the power of DNA testing serve to convince me that the fact of conviction is not sufficient to justify a State’s refusal to perform a test that will conclusively establish innocence or guilt.
This conclusion draws strength from the powerful state interests that offset the State’s purported interest in finality per se. When a person is convicted for a crime he did not commit, the true culprit escapes punishment. DNA testing may lead to his identification. See Brief for Current and Former Prosecutors as Amici Curiae 16 (noting that in more than one-third of all exonerations DNA testing identified the actual offender). Crime victims, the law enforcement profession, and society at large share a strong interest in identifying and apprehending the actual perpetrators of vicious crimes, such as the rape and attempted murder that gave rise to this case.
The arbitrariness of the State’s conduct is highlighted by comparison to the private interests it denies. It seems to me obvious that if a wrongly convicted person were to produce proof of his actual innocence, no state interest would be sufficient to justify his continued punitive detention. If such proof can be readily obtained without imposing a significant burden on the State, a refusal to provide access to such evidence is wholly unjustified.
In sum, an individual’s interest in his physical liberty is one of constitutional significance. That interest would be vindicated by providing postconviction access to DNA evi *100 dence, as would the State’s interest in ensuring that it punishes the true perpetrator of a crime. In this case, the State has suggested no countervailing interest that justifies its refusal to allow Osborne to test the evidence in its possession and has not provided any other nonarbitrary explanation for its conduct. Consequently, I am left to conclude that the State’s failure to provide Osborne access to the evidence constitutes arbitrary action that offends basic principles of due process. On that basis, I would affirm the judgment of the Ninth Circuit.
Ill
The majority denies that Osborne possesses a cognizable substantive due process right under the “circumstances of this case,” and offers two meager reasons for its decision. First, citing a general reluctance to “ ‘expand the concept of substantive due process,’ ” ante, at 72 (quoting Collins, 503 U. S., at 125), the Court observes that there is no long history of postconviction access to DNA evidence. “ ‘The mere novelty of such a claim,’ ” the Court asserts, “ ‘is reason enough to doubt that “substantive due process” sustains it,’” ante, at 72 (quoting Reno v. Flores, 507 U. S. 292, 303 (1993)). The flaw is in the framing. Of course courts have not historically granted convicted persons access to physical evidence for STR and mtDNA testing. But, as discussed above, courts have recognized a residual substantive interest in both physical liberty and in freedom from arbitrary government action. It is Osborne’s interest in those well-established liberties that justifies the Court of Appeals’ decision to grant him access to the State’s evidence for purposes of previously unavailable DNA testing.
The majority also asserts that this Court’s recognition of a limited federal right of access to DNA evidence would be ill advised because it would “short circuit what looks to be a prompt and considered legislative response” by the States and Federal Government to the issue of access to DNA evidence. Ante, at 73. Such a decision, the majority warns, *101 would embroil the Court in myriad policy questions best left to other branches of government. Ante, at 72-74. The majority’s arguments in this respect bear close resemblance to the manner in which the Court once approached the now-venerable right to counsel for indigent defendants. Before our decision in Powell v. Alabama, 287 U. S. 45 (1932), state law alone governed the manner in which counsel was appointed for indigent defendants. “Efforts to impose a minimum federal standard for the right to counsel in state courts routinely met the same refrain: ‘in the face of these widely varying state procedures,’ this Court refused to impose the dictates of ‘due process’ onto the states and ‘hold invalid all procedure not reaching that standard.’” Brief for Current and Former Prosecutors as Amici Curiae 28, n. 8 (quoting Bute v. Illinois, 333 U. S. 640, 668 (1948)). When at last this Court recognized the Sixth Amendment right to counsel for all indigent criminal defendants in Gideon v. Wainwright, 372 U. S. 335 (1963), our decision did not impede the ability of States to tailor their appointment processes to local needs, nor did it unnecessarily interfere with their sovereignty. It did, however, ensure that criminal defendants were provided with the counsel to which they were constitutionally entitled.[10] In the same way, a decision to recognize a limited right of postconviction access to DNA testing would not prevent the States from creating procedures by which litigants *102 request and obtain such access; it would merely ensure that States do so in a manner that is nonarbitrary.
While it is true that recent advances in DNA technology have led to a nationwide reexamination of state and federal postconviction procedures authorizing the use of DNA testing, it is highly unlikely that affirming the judgment of the Court of Appeals would significantly affect the use of DNA testing in any of the States that have already developed statutes and procedures for dealing with DNA evidence or would require the few States that have not yet done so to postpone the enactment of appropriate legislation.[11] Indeed, a holding by this Court that the policy judgments underlying that legislation rest on a sound constitutional foundation could only be constructive.
IV
Osborne has demonstrated a constitutionally protected right to due process which the State of Alaska thus far has *103 not vindicated and which this Court is both empowered and obliged to safeguard. On the record before us, there is no reason to deny access to the evidence and there are many reasons to provide it, not least of which is a fundamental concern in ensuring that justice has been done in this case. I would affirm the judgment of the Court of Appeals, and respectfully dissent from the Court’s refusal to do so.

 This ease is quite different from Dotson. In that case, two state prisoners filed § 1983 actions challenging the constitutionality of Ohio’s parole procedures and seeking “a new parole hearing that may or may not result in release, prescription of the composition of the hearing panel, and specification of the procedures to be followed.” 544 U. S., at 86 (Scalia, J., concurring). Regardless of whether such remedies fall outside the authority of federal habeas judges, compare id., at 86-87, with id., at 88-92 (Kennedy, J., dissenting), there is no question that the relief respondent seeks in this case — “exculpatory” evidence that tends to prove his innocence — lies “within the core of habeas corpus,” Preiser v. Rodriguez, 411 U. S. 475, 487 (1973).

 Forty-six States, plus the District of Columbia and the Federal Government, have recently enacted DNA testing statutes. See 18 U. S. C. § 3600; Ariz. Rev. Stat. Ann. § 13-4240 (West 2001); Ark. Code Ann. § 16-112-202 (2006); Cal. Penal Code Ann. §1405 (West Supp. 2009); Colo. Rev. Stat. Ann. § 18-1-413 (2008); Conn. Gen. Stat. § 52-582 (2009); Del. Code Ann., Tit. 11, §4504 (2007); D. C. Code §22-4133 to §22-4135 (2008 Supp.); Fla. Stat. § 925.11 (2007); Ga. Code Ann. § 5-5-41 (Supp. 2008); Haw. Rev. Stat. §844D-123 (2008 Cum. Supp.); Idaho Code §19-4902 (Lexis 2004); Ill. Comp. Stat., ch. 725, §5/116-3 (West 2006); Ind. Code §35-38-7-5 (West 2004); Iowa Code §81.10 (2009); Kan. Stat. Ann. §21-2512 (2007); Ky. Rev. Stat. Ann. §422.285 (Lexis Supp. 2008); La. Code Crim. Proc. Ann., Art. 926.1 (West Supp. 2009); Me. Rev. Stat. Ann., Tit. 15, §2137 (Supp. 2008); Md. Crim. Proc. Code Ann. § 8-201 (Lexis 2008); Mich. Comp. Laws Ann. §770.16 (West Supp. 2009); Minn. Stat. §590.01 (2008); Mo. Rev. Stat. §547.035 (2008 Cum. Supp.); Mont. Code Ann. §46-21-110 (2007); Neb. Rev. Stat. §29-4120 (2008); Nev. Rev. Stat. §176.0918 (2007); N. H. Rev. Stat. Ann. §651-D:2 (2007); N. J. Stat. Ann. §2A:84A-32a (West Supp. 2009); N. M. Stat. Ann. § 31-1A-2 (Supp. 2008); N. Y. Crim. Proc. Law Ann. §440.30(l-a) (West 2005); N. C. Gen. Stat. Ann. §15A-269 (Lexis 2007); N. D. Cent. Code Ann. §29-32.1-15 (Lexis 2006); Ohio Rev. Code Ann. §2953.72 (Lexis Supp. 2009); Ore. Rev. Stat. § 138.690 (2007); 42 Pa. Cons. Stat. §9543.1 (2006); R. I. Gen. Laws §10-9.1-11 (Lexis Supp. 2008); S. C. Code Ann. §17-28-30 (Supp. 2008); Tenn. Code Ann. §40-30-304 (2006); Tex. Code Crim. Proc. Ann., Arts. 64.01-64.05 (Vernon 2006 and Supp. 2008); Utah Code Ann. §78B-9-300 to §78B-9-304 (2008 Lexis Supp.); Vt. *80 Stat. Ann., Tit. 13, § 5561 (Supp. 2008); Va. Code Ann. § 19.2-327.1 (Lexis 2008); Wash. Rev. Code §10.73.170 (2008); W. Va. Code Ann. §15-2B-14 (Lexis Supp. 2008); Wis. Stat. § 974.07 (2005-2006); Wyo. Stat. Ann. § 7-12-303 (2008 Supp.). The pace of the legislative response has been so fast that two States have enacted statutes while this case was sub judice: The Governor of South Dakota signed a DNA access law on March 11, 2009, see H. R. 1166, and the Governor of Mississippi signed a DNA access law on March 16, 2009, see S. 2709. The only States that do not have DNA testing statutes are Alabama, Alaska, Massachusetts, and Oklahoma; and at least three of those States have addressed the issue through judicial decisions. See Fagan v. State, 957 So. 2d 1159 (Ala. Crim. App. 2007); Osborne v. State, 110 P. 3d 986, 995 (Alaska App. 2005) (Osborne I); Commonwealth v. Donald, 66 Mass. App. 1110, 848 N. E. 2d 447 (2006). Because the Court relies on such evidence, Justice Stevens accuses it of “resembling]” Justice Harlan’s position in Miranda v. Arizona, 384 U. S. 436 (1966). See post, at 101, n. 10 (dissenting opinion) (quoting 384 U. S., at 523-524). I can think of worse things than sharing Justice Harlan’s judgment that “this Court’s too rapid departure from existing constitutional standards” may “frustrat[e]” the States’ “long-range and lasting” legislative efforts. Id., at 524.

The state court noted that respondent’s trial counsel “‘disbelieved Osborne’s statement that he did not commit the crime’” and therefore “ ‘elected to avoid the possibility of obtaining DNA test results that might have confirmed Osborne’s culpability.’” Osborne I, 110 P. 3d, at 990. Given the reasonableness of trial counsel’s judgment, the state court held that respondent’s protestations (whether or not he made them) were irrelevant. Id,., at 991-992.

 In adopting rules regarding postconvietion DNA testing, the Federal and State Governments may choose to alter the traditional authority of defense counsel with respect to DNA testing. For example, the federal statute provides that a prisoner’s declination of DNA testing at trial bars a request for postconviction testing only if the prisoner knowingly and voluntarily waived that right in a proceeding occurring after the enactment of the federal statute. 18 U. S. C. § 3600(a)(3)(A)(i). But Alaska has specifically decided to retain the general rule regarding the authority of *87 defense counsel. See Osborne I, supra, at 991-992 (citing Simeon v. State, 90 P. 3d 181, 184 (Alaska App. 2004)).

 Justice Stevens is quite wrong to suggest that the application of this familiar principle in the present context somehow lessens the prosecution’s burden to prove a defendant’s guilt. Post, at 97-98, n. 8 (citing Sandstrom v. Montana, 442 U. S. 510 (1979); In re Winship, 397 U. S. 358 (1970)). Respondent is not challenging the sufficiency of the State’s evidence at trial. Rather, he claims that he has a right to obtain evidence that may be useful to him in a variety of postconviction proceedings. The principle that the prosecution must prove its ease beyond a reasonable doubt and the principle that a defendant has no obligation to prove his innocence are not implicated in any way by the issues in this case.

 Because the Court assumes, arguendo, that Osborne’s claim was properly brought under 42 U. S. C. § 1983, rather than by an application for the writ of habeas corpus, I shall state only that I agree with the Ninth Circuit’s endorsement of Judge Luttig’s analysis of that issue. See 423 F. 3d 1050, 1053-1055 (2005) (citing Harvey v. Horan, 285 F. 3d 298, 308-309 (CA4 2002) (opinion respecting denial of rehearing en banc)); see also McKithen v. Brown, 481 F. 3d 89, 98 (CA2 2007) (agreeing that a claim seeking postconviction access to evidence for DNA testing may be properly brought as a § 1983 suit); Savory v. Lyons, 469 F. 3d 667, 669 (CA7 2006) (same); Bradley v. Pryor, 305 F. 3d 1287, 1290-1291 (CA11 2002) (same).

 Ordinarily, claims under § 12.72.010(4) must be brought within one year after the conviction becomes final. § 12.72.020(a)(3)(A). However, the court may hear an otherwise untimely claim based on newly discovered evidence “if the applicant establishes due diligence in presenting'the claim and sets out facts supported by evidence that is admissible and (A) was not known within ... two years after entry of the judgment of conviction if the claim relates to a conviction; . . . (B) is not cumulative to the evidence presented at trial; (C) is not impeachment evidence; and (D) establishes by clear and convincing evidence that the applicant is innocent.” § 12.72.020(b)(2) (2002).

 Osborne contends that the Court should assess the validity of the State’s procedures under the test set forth in Mathews v. Eldridge, 424 U. S. 319 (1976), rather than the more exacting test adopted by Medina v. California, 505 U. S. 437 (1992). In my view, we need not decide which standard governs because the state court’s denial of access to the evidence Osborne seeks violates due process under either standard. See Harvey, 285 F. 3d, at 315 (Luttig, J.).

 The State explained at oral argument that such testing was ordered in the Patterson ease, but by the time access was granted, the relevant evidence had been destroyed. See Tr. of Oral Arg. 12.

 The majority avoids confronting this serious flaw in the state court’s decision by treating its mistaken characterization of the nature of Osborne’s request as if it were binding. See ante, at 71. But see ante, at 59, n. 2 (conceding “[i]t is not clear” whether the state court erred in reaching that conclusion).

 See Harvey, 285 F. 3d, at 318 (Luttig, J.) (“[T]he claimed right of access to evidence partakes of both procedural and substantive due process. And with a claim such as this, the line of demarcation is faint”).

 Justice Alito provides a detailed discussion of dangers such as laboratory contamination and evidence tampering that may reduce the reliability not only of DNA evidence, but of any type of physical forensic evidence. Ante, at 80-84 (concurring opinion). While no form of testing is error proof in every case, the degree to which DNA evidence has become a foundational tool of law enforcement and prosecution is indicative of the general reliability and probative power of such testing. The fact that errors may occur in the testing process is not a ground for refusing such testing altogether — were it so, such evidence should be banned at trial no less than in postconviction proceedings. More important still is the fact that the State now concedes there is no reason to doubt that if STR and mtDNA testing yielded exculpatory results in this case, Osborne’s innocence would be established.

 In his concurring opinion, Justice Auto suggests other reasons that might motivate States to resist access to such evidence, including concerns over DNA testing backlogs and manipulation .by defendants. See ante, at 83-84. Not only were these reasons not offered by the State of Alaska as grounds for its decision in this ease, but they are not in themselves compelling. While state resource constraints might justify delays in the *98 testing of postconviction DNA evidence, they would not justify an outright ban on access to such evidence. And Justice Auto’s concern that guilty defendants will “play games with the criminal justice system” with regard to the timing of their requests for DNA evidence is not only speculative, but gravely concerning. Ante, at 85. It bears remembering that criminal defendants are under no obligation to prove their innocence at trial; rather, the State bears the burden of proving their guilt. See Sandstrom v. Montana, 442 U. S. 510 (1979); In re Winship, 397 U. S. 358 (1970). Having no obligation to conduct pretrial DNA testing, a defendant should not be bound by a decision to forgo such testing at trial, particularly when, as in this ease, the choice was made by counsel over the defendant’s strong objection. See Osborne I, 110 P. 3d, at 990-991. (Justice Auto suggests there is reason to doubt whether Osborne asked his counsel to perform DNA testing prior to trial, ante, at 85-86. That fact was not disputed in the state courts, however. Although Osborne’s trial counsel averred that she did “not have a present memory of Osborne’s desire to have [a more specific discriminatory] test of his DNA done,” she also averred that she was “willing to accept that he does” and that she “would have disagreed with him.” 110 P. 3d, at 990 (internal quotation marks omitted).)

 See generally Brief for Current and Former Prosecutors as Amici Curiae; Brief for Jeanette Popp et al. as Amici Curiae; see also Brief for Individuals Exonerated by Post-Conviction DNA Testing as Amici Curiae 1-20. See also Garrett, Judging Innocence, 108 Colum. L. Rev. 55, 109 (2008) (documenting that in 50% of cases in which DNA evidence exonerated a convicted person, reviewing courts had commented on the exoneree’s likely guilt and in 10% of the cases had described the evidence supporting conviction as “ ‘overwhelming’ ”).

 The majority’s position also resembles that taken by Justice Harlan in his dissent in Miranda v. Arizona, 384 U. S. 436, 523 (1966), in which he faulted the Court for its “ironic untimeliness.” He noted that the Court’s decision came at time when scholars, politicians, and law enforcement officials were beginning to engage in a “massive reexamination of criminal law enforcement procedures on a scale never before witnessed,” and predicted that the practical effect of the Court’s decision would be to “handicap seriously” those sound efforts. Id., at 523-524. Yet time has vindicated the decision in Miranda. The Court’s refusal to grant Osborne access to critical DNA evidence rests on a practical judgment remarkably similar to Justice Harlan’s, and I find the majority’s judgment today as profoundly incorrect as the Miranda minority’s was yesterday.

 The United States and several States have voiced concern that the recognition of a limited federal right of access to DNA evidence might call into question reasonable limits placed on such access by federal and state statutes. See Brief for United States as Amicus Curiae 17-26; Brief for State of California et al. as Amici Curiae 1-16. For example, federal law and several state statutes impose the requirement that an applicant seeking postconviction DNA testing execute an affidavit attesting to his innocence before any request will be performed. See, e. g., 18 U. S. C. § 8600(a)(1); Fla. Stat. § 925.11(2)(a)(3) (2007). Affirming the judgment of the Ninth Circuit would not cast doubt on the constitutionality of such a requirement, however, since Osborne was never asked to execute such an affidavit as a precondition to obtaining access to the State’s evidence. Similarly, affirmance would not call into question the legitimacy of other reasonable conditions States may place on access to DNA testing, such as Alaska’s requirement that test results be capable of yielding a clear answer with respect to guilt or innocence. “[D]ue process is flexible,” Morrissey v. Brewer, 408 U. S. 471, 481 (1972), and the manner in which it is provided may reasonably vary from State to State and case to ease. So long as the limitations placed on a litigant’s access to such evidence remain procedurally fair and nonarbitrary, they will comport with the demands of due process.